**Travis PAUL, Plaintiff-Appellant,**

v.

**PETROLEUM EQUIPMENT TOOLS CO., Defendant-Appellee.**

No. 82–3216.

United States Court of Appeals, Fifth Circuit.

June 27, 1983.

Rehearing and Rehearing En Banc Denied Aug. 15, 1983.

---

Randall, Circuit Judge, dissented and filed opinion.

Hawley & Schexnayder, Ltd., Nelson J. Schexnayder, Jr., Lafayette, La., for plaintiff-appellant.

Davidson, Meaux, Sonnier & Roy, L. Lane Roy, Lafayette, La., for defendant-appellee.

Before RANDALL and HIGGINBOT-HAM, Circuit Judges, and BUCHMEYER,* District Judge.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Travis Paul, a company airplane pilot, brought this suit against Petroleum Equipment Tools Co., his former employer, seeking overtime pay allegedly due under the Fair Labor Standards Act. 29 U.S.C. §§ 201–219. After a bench trial, the district court concluded that Paul was employed in a bona fide professional capacity within the meaning of 29 U.S.C. § 213(a)(1) and its regulations and therefore was exempt from the overtime provisions of the FLSA. Taking judicial notice of Federal Aviation Administration regulations detailing the level of skill needed to fly PETCO's airplane, we affirm the district court's determination that Paul was employed in a professional capacity.

On January 12, 1979, PETCO hired Travis Paul to fly one of its company airplanes, a twin-engine, turboprop Beechcraft King Air B100 located in Lafayette, Louisiana. Paul was an experienced pilot and had long earned his living as a commercial pilot. Since learning to fly at England's Flying Service in Mobile, Alabama in 1966, Paul had logged 4900 hours of flying time as pilot-in-command of numerous types of airplanes. He held an airline transport pilot certificate, a flight instructor certificate, an instrument rating, and was authorized to fly both single and multiengine airplanes. At PETCO, Paul not only flew the plane but also cleaned it, stocked it, prepared reports of expenses and flight operations, and maintained charts and manuals. He received a monthly salary ranging from $1700 to $2081.

Paul resigned from PETCO on September 19, 1980. He then brought suit against PETCO seeking overtime compensation and liquidated damages under the FLSA and penalty wages under Louisiana law. PETCO asserted numerous defenses, including the claim that Paul was a professional and

---

* District Judge of the Northern District of Texas, sitting by designation.

thus was exempt from the FLSA's overtime provisions. During the three day bench trial, the parties focused primarily on the accuracy of Paul's reported "duty time," on the existence of a company bonus plan, and on Paul's understanding regarding the hours he was required to work. The district court did not reach these issues; it instead ruled that Paul was exempt from the FLSA because he was employed in a bona fide professional capacity. Paul appeals, claiming that the record evidence does not support this finding.

■■■ The FLSA exempts from its overtime provisions "any employee employed in a bona fide executive, administrative, or professional capacity...." 29 U.S.C. § 213(a)(1). The employer bears the burden of proving exempt status. *See Usery v. Associated Drugs, Inc.,* 538 F.2d 1191, 1194 (5th Cir.1976). In addition, the exemptions contained in the Act are to be narrowly construed against the employer. *See Brennan v. Greene's Propane Gas Service, Inc.,* 479 F.2d 1027, 1032 (5th Cir.1973). While there may be uncertainty in the deference to be given a trial court's ultimate conclusion of exempt status, *see Jacksonville Paper Co. v. McComb,* 167 F.2d 448 (5th Cir. 1948), there is no disagreement that the subsidiary facts underlying that determination are governed by the "clearly erroneous" standard of Fed.R.Civ.P. 52(a). *See, e.g., Continental Oil Co. v. Cole,* 634 F.2d 188, 191 (5th Cir.1981). *See also Robicheaux v. Radcliff Material, Inc.,* 697 F.2d 662, 666 (5th Cir.1983).

Determination of professional status is guided by regulations issued by the Secretary of Labor and the Administrator of the Wage-Hour Division pursuant to congressional direction. These regulations permit an employer to use either a "long test" or a "streamline test" to meet its burden of proving an employee's professional status. Under the long test, a court may decide that an employee is an exempt professional only if the conditions of his employment satisfy the requirements set forth in 29 C.F.R. § 541.3(a)–(e). If, however, an employee receives a minimum weekly salary of $250, the employer's contention that he is exempt may be measured by the shorter streamline test described in 29 C.F.R. §§ 541.3(e), .315. Because it is undisputed that Paul received at least $250 weekly, the district court properly resorted to the streamline test.

Under this test, PETCO must show that Paul's "primary duty consists of the performance of work requiring knowledge of an advanced type in a field of science or learning ... which includes work requiring the consistent exercise of discretion and judgment." §§ 544.3(e), .315.[1] "Primary duty" means that "the major part, or over 50 percent, of the employee's time" must be spent performing exempt work. § 541.103. Activities that are "an essential part of and necessarily incident to" the professional work are also exempt. § 541.307. Exempt work involving advanced learning is described in § 541.302. Such work requires knowledge of an advanced type that generally cannot be attained at the high school level. This knowledge must be in a field of science or learning as distinguished from the mechanical arts. It also must be "customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes." § 541.3(a)(1). Finally, a "prime characteristic of professional work is the fact that the employee does apply his special knowledge or talents with discretion and judgment. Purely mechanical or routine work is not professional." § 541.-305(b).

In applying these regulations to Paul, the district court first found that Paul's work required the exercise of discretion and

---

1. The regulations also recognize that work in artistic or teaching fields is of a professional nature. These provisions, of course, are inapplicable here. Nevertheless, we note that an aircraft flight instructor, like Paul, expressly falls within the professional exemption for teachers. *See* 29 C.F.R. § 541.302(g)(2).

judgment. The court noted, "He made the final decision of whether or not to fly and he chose the safest and most efficient route. Airborne, he was consistently exposed to periods wherein at any moment he might be required to make an instant judgment, drawing on knowledge acquired through flight training." We find that these findings of fact are not clearly erroneous. Two PETCO pilots testified that they had the sole authority to decide whether possible weather disturbances would require cancellation of the flight or alteration of the route. They also testified that they had to decide whether a particular plane was "airworthy." Such decisions are not "purely mechanical or routine" but involve considerable discretion and judgment. This case is thus materially different from *Martin v. Penn Line Service, Inc.,* 416 F.Supp. 1387 (W.D.Pa.1976), on which Paul relies. The court there held that helicopter pilots hired to control forest fires, spray brush, and take aerial photographs did not exercise the requisite discretion and judgment because they were "merely highly trained technicians" who could not make decisions without consulting with their superior. *Id.* at 1390. In contrast, Paul had sole authority to make decisions about problems to which there were often no recognized or established answers. *See* § 541.207.

The district court also found that Paul was engaged in a "learned profession" within the meaning of § 541.3(a)(1) and § 541.302. It reasoned:

> Ability to make snap judgments based on unexpected flight conditions is not an "inherent talent" but is attained after specialized instruction required of pilots before being licensed.... Paul's numerous F.A.A. licenses for highly technical aircraft are the best evidence of his advanced knowledge acquired by study and training and to this Court are the functional equivalents of the advanced degree which is a prima facie showing of professional status under the regulations.

Paul argues that this finding is flawed in two respects. One deficiency is that PET-

CO made no showing that his "numerous F.A.A. licenses" were needed to fly the company plane. A second problem is that PETCO presented no evidence regarding the level of skill and training needed to obtain those licenses. While we agree with Paul that these are indeed the relevant inquiries and that without the explanatory aid of controlling regulations the "evidence" of Paul's level of training is scarce, we nonetheless find that Paul was engaged in a "learned profession" and thus was employed in a professional capacity.

Paul's first contention is that PETCO failed to show he needed his airline transport pilot certificate with single and multiengine class ratings to fly the company plane. He thus suggests that any skill and training needed to obtain this license is irrelevant in the determination of his professional status. It is true that the record nowhere explicitly states whether an ATP certificate is "required" to fly PETCO's airplane. It does show, however, that Paul in his job application represented that he had this rating. There was no direct evidence that the rating was a prerequisite for the job. But having been hired as a pilot with a listed skill level, Paul is in no position to now suggest that less was "required" by PETCO simply because the law required less. Regardless, Paul could not legally fly the PETCO aircraft with passengers at any distance without a commercial pilot certificate and an instrument rating, *see* 14 C.F.R. § 61.129, .139, a classification one notch below an ATP certificate. *See* 14 C.F.R. § 61.171.

Paul's second contention is that PETCO offered no specific evidence of the level of skill and training required to obtain such licenses. This deficiency is not a problem, however, because we may take judicial notice of Federal Aviation Administration regulations establishing the requirements for these licenses. Judicial notice of such regulations is expressly authorized by 44 U.S.C. § 1507 and may be taken by an appellate court. *See* Fed.R.Evid. 201(f).[2]

---

**2.** In taking this judicial notice, we do not, as the dissent suggests, "go to considerable

lengths to fill in the gap in the Company's

We thus must determine whether these regulations detailing the requirements for Paul's ratings establish that Paul had knowledge of an advanced type in a field of learning that was acquired by a prolonged course of specialized intellectual instruction and study. We conclude that they do.

The threshold requirements for a commercial pilot certificate include proof that the applicant holds a private pilot certificate, is more than 18 years old, is able to read, speak, and understand English, and is medically certified. The applicant must thereafter demonstrate extensive aeronautical knowledge, proficiency, and experience. In demonstrating the requisite knowledge, the applicant must have taken ground instruction or completed a course of instruction or private study to learn the regulations governing commercial pilots, the accident reporting requirements of the National Transportation Safety Board, basic aerodynamics and flight principles, and numerous airplane operations. The applicant also must pass a written test on these subjects. Flight proficiency is obtained through instruction by an authorized flight instructor. This instructor must certify that the applicant is prepared to perform preflight duties, flights at critically slow airspeeds, normal and crosswind takeoffs and landings, maximum performance takeoffs and landings, and emergency procedures. This proficiency must be demonstrated through oral and flight tests. Finally, the applicant must have a total of 250 hours of flight time including 100 hours in powered aircraft, 50 hours of flight instruction, and 100 hours of pilot-in-command time. See 14 C.F.R. §§ 61.121—.141.

Having obtained a commercial license, a pilot who desires to fly passengers for hire in flights of more than 50 nautical miles or at night also must obtain an instrument rating. See 14 C.F.R. § 61.129(a). Like the commercial licensing requirements, an instrument rating requires the applicant to demonstrate extensive knowledge, skill, and experience. In demonstrating the requisite knowledge, the applicant must have received ground instruction or logged home study to learn instrument flight rules (IFR), IFR navigation, use of aviation weather reports and forecasts, and the safe operation of airplanes under instrument weather conditions. The applicant must pass a written examination on these subjects. The requisite instrument training is obtained through instruction by an authorized flight instructor, who must certify that the applicant is competent to control and maneuver an airplane solely by reference to instruments, to use IFR navigation, to perform instrument approaches, to fly cross-country in IFR conditions, and to respond to emergencies. The applicant then must pass a flight test to demonstrate these skills. Finally, the applicant must have logged 200 hours of pilot flight time, 40 hours of instrument time, and 15 hours of instrument flight instruction. See 14 C.F.R. § 61.65.

Contrary to Paul's argument that flying is only a mechanical art or skill, these regulations demonstrate that a pilot with a commercial license and instrument rating indeed has "knowledge in a field of science or learning." As these regulations make plain, a pilot must acquire extensive knowledge of aerodynamics, airplane regulations, airplane operations, instrument procedures, aeronautical charts, and weather forecasting. An examination of the FAA's official testing manuals that supplement the regulations demonstrates in greater detail the high level of aeronautical knowledge that an applicant must achieve. For example, the FAA's *Commercial Pilot Airplane Written Test Guide, AC 61–71B* (1979) contains a detailed six page study outline and 120 pages of sample questions that require knowledge of a wide and varied nature. Similarly, the *Instrument Rating Written Test Guide, AC 61–8D* (1977) outlines nearly sixty major topics ranging from "unusual flight conditions" to "physiological factors."

proof." These "considerable lengths" represent no more than our duty to apply extant law and regulations. In this respect, neither 44 U.S.C. § 1507 nor F.R.E. 201(f) is arguably necessary to our consideration of the regulations. We need not digress here because they are properly before us at least by the rule and statute if not simply as citable legal material.

While these topics might not be as abstract and esoteric as those in law or medicine, it is difficult to argue that they are less complex than those learned by nurses, accountants, and actuarial computants who are regarded as employees in "learned professions." *See* 29 C.F.R. § 541.302(e)(1).

We also are persuaded that this knowledge is today, by necessity, "customarily acquired by a prolonged course of specialized intellectual instruction and study as distinguished from a general academic education and from an apprenticeship and from training in the performance of routine mental, manual, or physical processes." Under the FAA regulations, an applicant for a commercial license and instrument rating is *required* to log instruction from an authorized flight instructor who must certify that the applicant is competent in an array of areas relating to flight proficiency. *See* 14 C.F.R. § 61.65(c), .127. *Only* when the applicant has obtained this instruction is he eligible to take the requisite flight tests. *See* § 61.39. Much of this instruction occurs aloft and is a specie of tutorial teaching, as demonstrated by a description from the FAA's *Flight Training Handbook, AC 61–21* (1980):

> During the training period, the instructor will explain each lesson before the flight. This explanation will include *what* will be done, *why* it should be done, and *how* it should be done. Any point that is not clear should be questioned. By asking questions on the ground, considerable time can be saved for in-flight instruction.... After each flight, the instructor will review the day's lesson. This is the student's chance to clear up any mistaken ideas about each element of a procedure or maneuver....

*Id.* at 1–2 (emphasis in original). The instruction thus requires an integration of knowledge, abstract reasoning, and physical skill.[3]

The fact that an applicant also must log considerable flying time does not mean, as Paul suggests, that a pilot's knowledge is obtained only "through a general apprenticeship, on-the-job training or learning-by-doing method." Whatever the circumstances in barnstorming days, a suggestion that a pilot of a modern multi-million dollar turboprop aircraft can obtain his experience through experimentation and without supervision is startling. The foundation of a pilot's experience is indisputably extensive, formal, and specialized training. His experience is thus of a different quality from that of many employees in industry who rise to high-level positions by their natural ability, common sense, and longevity without the aid of a course of study. As the regulations note, these individuals are not professionals. *See* 29 C.F.R. § 541.-302(e)(2). In contrast, pilots like Paul attain their status after a prolonged course of specialized instruction and study that certainly is fairly described as an intellectual endeavor, despite its distance from campus.

■ Aided by the FAA regulations and handbooks, we are persuaded that Paul performed exempt professional work. The Wage and Hour Division, whose interpretations are entitled to "great weight," *Boutell v. Walling,* 327 U.S. 463, 470–71, 66 S.Ct. 631, 635–636, 90 L.Ed. 786 (1946), has, without vacillation, been unwilling to take a contrary position for at least fifteen years.[4] While the Division has noted that "pilots as a class cannot be considered exempt professional employees on an industry wide basis," *see Application of Policy (Flight Per-*

---

**3.** The *Flight Training Handbook* also states that "[f]light training, if it is to be truly effective, involves more than learning the mechanical manipulation of an airplane's flight controls. Physical or mechanical skill alone is not enough. Operational knowledge and understanding of the associated elements are particularly essential in flying, where safety is the most important factor." *Id.* at 1.

**4.** Our research suggests that in fact this has been the position of the Wage and Hour Division since 1954. One labor law service notes that in 1954 the Division was willing to extend the exemption to company pilots "who have augmented their knowledge with continued study and considerable experience" and have met "other tests." *See* Lab.L.Rep. (CCH) ¶ 25,210.80 (summarizing W–H Opinion Letter of October 15, 1954).

*sonnel),* 6 Lab.Rel.Rep. (BNA) 92:653–54 (1976), it also has stated that it will take "no action" against a defined subclass of pilots of which Paul is a member. That is, an assertion of exempt status by the employer of any pilot with Paul's rating and experience level would not be opposed:

> [T]he Wage and Hour Division will take no enforcement action with respect to pilots or copilots of airplanes and rotor-craft who hold an FAA Airline Transport Certificate or Commercial Certificate who are paid not less than $300 per week and who are engaged in the ... [f]lying of aircraft as business or company pilots.

*Flight Personnel Salary Test,* Op. WH–357, 6 Lab.Rel.Rep. (BNA) 92:685–86 (Sept. 2, 1975). This position reaffirms the "no action" opinions issued in 1971, *see Pilots With FAA or Commercial Certificate,* Op. WH–133, *id.* at 92:681 (May 25, 1971) ($225 minimum), and in 1967, *see* Op. WH–553, Lab.L.Rep. (CCH) ¶ 30,540 (Feb. 8, 1967) ($175 minimum). It is then not surprising to find no litigated cases involving pilots with Paul's level of training. The near universal acceptance of such a classification may be in part a realization that such pilots in the cockpits of commercial aircraft requiring capital outlays in excess of one million dollars, as here, do not need the protection of overtime wage rates. That commercial pilots command such income as to make overtime rates virtually irrelevant apart from matters of ill will and spite responds to a demand for persons of that training and skill. Their scarcity belies the idea that acquiring the requisite judgment and skill is not the product of rigorous study or serious intellectual endeavor. That idea takes a provincial view of education that we do not find in the act and its interpretation. The "no action" position of the Wage and Hour Division reflects that agency's recognition of these economic realities.[5] Like the Wage and Hour Division, we do not decide that company pilots as a class perform exempt professional work. We face here only a pilot like Paul with the highest flight rating, considerable training, and job experience.

Having correctly determined that Paul performed exempt work, the district court then concluded that his "primary duty" consisted of such work. The court noted, "While Paul spent approximately thirty to forty per cent of his work time flying the plane, he spent less than twenty per cent of his work time performing tasks non-essential to a pilot's professional duties. . . . Paul was primarily engaged in responsible work characteristic of employment in a bona fide professional capacity." We find that this finding of fact is not clearly erroneous. Paul testified that approximately one-third of his duty time consisted of actually flying the plane. Testimony of other PETCO pilots indicated that a minimal amount of time was spent on routine, non-exempt tasks, including cleaning and stocking the plane. The rest of his duty time involved work that was "necessarily incident" to flying. This included waiting time between flights, the preparation of reports of expenses and flight operations, and the maintenance of charts and manuals. The record thus demonstrates that Paul spent over fifty percent of his time performing exempt work.

---

**5.** The dissent points out, and we agree, that this "no action" position is not equivalent to an exemption. It is worth mentioning, however, that the privately published *Wages and Hours Manual* characterizes all company pilots earning $300 or more a week as "exempt." The status of all other company pilots is listed as "uncertain." The checklist reads as follows:

| Job Title | Exempt | Non–Exempt | Uncertain | Opinion Letter Date |
|---|---|---|---|---|
| Company Airplane Pilot | X* | | X | 5/25/73 |

*If paid $300 a week or more (1975 and thereafter).
*See Checklist on Jobs Qualifying for White–Collar Exemption,* 6 Lab. Rel. Rep. (BNA) 92:531–32 (1976).

The trial court found that Paul fit within the streamline test for professional status and PETCO sustained its burden of proving that Paul was employed in a bona fide professional capacity and therefore was exempt from the overtime provisions of the FLSA. Finding this conclusion to be supported by subsidiary factual findings that were not clearly erroneous, we affirm.[6]

AFFIRMED.

RANDALL, Circuit Judge, dissenting:

Although I fully agree with the majority's conclusion that a highly skilled and well paid company pilot such as Paul "do[es] not need the protection of overtime wage rates," I am unable to discover anywhere in this case anything that would enable us to determine whether knowledge of the type that Paul theoretically has, by virtue of his certificates, is "*customarily* acquired by a prolonged course of specialized intellectual instruction and study." 29 C.F.R. § 541.-302(d) (emphasis added). I therefore respectfully dissent.

Since an employer must carry the burden of proving that an exemption applies, and since (as the majority concedes) PETCO has presented no evidence on the "customarily acquired" question, the majority has had to go to considerable lengths to fill in the gaps in the Company's proof. What the majority has done is to show what a pilot with Paul's FAA certificates must know to pass the requisite examinations; from the sophistication and complexity of that knowledge, the majority infers that it must necessarily be "customarily acquired by a prolonged course of specialized intellectual instruction and study." If it were possible validly to draw this inference simply from the *Code of Federal Regulations* and the various test guides published by the FAA, the Wage and Hour Division would have done so by now.

It has not. The Division has been willing for some years, as the majority points out, to take a "no action" position with respect to certain highly paid pilots, but it has never *exempted* those pilots. Indeed, it has consistently declined to do so. A "no action" letter from an enforcement agency is simply not the same thing as a general exemption. The result of today's decision, however, will be to establish just such a general exemption.

The record in this case is deficient. We have no idea how most commercial, instrument-rated pilots acquire their training; nor do we know how Paul acquired his. I would therefore reverse.

6. With deference to our dissenting sister, if this evidence will not support a finding of professional status it would be most difficult to find *any* commercial pilot with ratings like Paul's to be a professional. Expressed differently, we are uncertain of what evidence the employer ought here to have offered. If the dissenting view were adopted we have little doubt but the virtually complete absence of litigation between such pilots and employers would be abruptly halted. We ought to be hesitant to upset such settled expectations, particularly when undoubtedly they have been encouraged by the interpretative position of the law's administrator.