Kimball V. RAGNONE, Plaintiff,

v.

**BELO CORP., a Texas corporation, and King Broadcasting Company, a Washington corporation, dba KGW–TV, Defendants.**

No. CIV 99–1716–KI.

United States District Court,
D. Oregon.

Jan. 25, 2001.

---

Timothy J. Vanagan, Gresham, OR, for Plaintiff.

Richard N. Van Cleave, Kathleen R. Dent, Davis Wright Tremaine LLP, Portland, OR, for Defendants.

## OPINION

KING, District Judge.

Plaintiff Kimball Ragnone was employed by defendants Belo Corp. and King Broadcasting Co., dba KGW–TV, as pilot of the news helicopter until his termination. Before the court is plaintiff's motion for partial summary judgment (# 24) and defendants' motion for summary judgment (# 44). For the reasons below, I dismiss the wrongful discharge claim and conclude that Ragnone is nonexempt but is not entitled to overtime wages for on-call time.

## FACTS

Kimball Ragnone was employed full time by defendants as a helicopter pilot beginning on August 1, 1997. Michial Rausch was the executive news director and Ragnone's direct supervisor until

Rausch left KGW in August 1998. Rausch was then replaced by Rod Gramer.

Ragnone has a high school diploma. To be qualified to fly a helicopter, Ragnone went to flight training school which took less than three months. There he learned basic aerodynamics and how to fly a helicopter. His commercial license requires 150 additional hours of piloting command time and an additional examination. Ragnone also took a one-week class from Bell Helicopter.

Ragnone's annual salary began at $65,000. In addition to this salary, KGW paid Ragnone an additional $150 for each half day and $250 for each full day he worked beyond his regular workweek, 10:00 a.m. to 7:00 p.m. Monday through Friday. Ragnone carried a pager in case KGW wanted him to pilot the helicopter at other times. There were no geographical restrictions on Ragnone during his off-duty hours. He could decline to respond to a call and did so a few times. No one ever told Ragnone that he could not drink while on-call. Ragnone, by his own decision, does not drink so this may not have been an issue. Ragnone was to provide advance notice to KGW so they could arrange for a backup pilot during his vacations.

Ragnone managed KGW's helicopter program. He was actually flying the helicopter about 25% of the time at work, with remaining hours used to maintain the helicopter, arrange for service, and wait for reporters prior to flight. He worked without day to day supervision. Rausch gave Ragnone complete discretion to decide whether it was safe to fly and to choose the safest and most efficient flight route. Ragnone agrees that he could make the final decision on whether to fly but he felt at times that if he did not fly, his job was in jeopardy.

In a performance review dated August 14, 1998, Thomsen noted as one of Ragnone's strengths that he made "safety first." "Kim shows no sign of hesitation of declaring conditions unfit for flying, if he feels safety is at issue." Dent Depo., Ex. 4 at 1.

Ragnone felt intense pressure to fly more frequently than he thought safe. Ragnone agrees that there were days when he refused to fly because he believed that it would be unsafe. Gramer told Ragnone that he played the safety card too much. This was Ragnone's reputation at the station. Rausch teased Ragnone about his refusals to fly but Ragnone received no repercussions from Rausch. Ragnone believes, however, that Gramer was unhappy if there were days that he refused to fly when other stations had their helicopters in the air.

During the coverage of the New Carissa grounding, Ragnone worked 15–20 hours on many days, flying in intense weather. Gramer told him to get closer photos of the ship's hull, like the pilot at Channel 6, even after Ragnone told Gramer that the other pilot was violating air space restrictions. One day, Ragnone told Gramer that he was too tired to fly any more that day and it was too dark to fly without reference lighting. Gramer told the reporter on board to tell Ragnone to continue to fly without discussing the situation any further with Ragnone. Soon thereafter, Ragnone met with Michael Grant, the station's general manager, who suggested Ragnone resign in exchange for a settlement. Grant's notes for the meeting indicate that Channel 6 was up through the story.

In another incident, Gramer told Ragnone to fly after being told by him that the fuel was too low and the winds too great to fly in the Columbia Gorge. Although Gramer insisted that Ragnone remain in the air, Ragnone returned to Troutdale to refuel. Another time, a reporter heard Ragnone tell Gramer that he did not feel right about continuing to fly to look for a lost hiker because he was running low on fuel and concerned about the wind. The reporter heard Gramer "basically order" Ragnone, in a slightly raised voice, to keep flying. Fuller Depo. at 13.

Beginning in February 1999, Gramer required Ragnone to provide a written explanation whenever he refused to fly. Gramer explained that safety was Ragnone's decision, and nobody would make him fly when it was unsafe, but as the supervisor Gramer wanted an explanation. Gramer did not trust Ragnone and checked with Bell Helicopter and the FAA weather desk to confirm information Ragnone gave him. Gramer admits to being frustrated when he knew other stations were flying their helicopters and Ragnone thought it was unsafe to fly.

Ragnone submitted his resignation on November 2, 1998, due to the pressure and Gramer's position on safety. Gramer asked Ragnone to reconsider and remain employed by KGW. Ragnone did so.

On June 23, 1999, Ragnone met with Gramer and Dave Thomsen, the assistant news director, to discuss issues with Ragnone's performance. The conversation did not go well. Ragnone told them "Fuck your helicopter" in a raised voice and started to leave the room. Ragnone Depo. at 5. Ragnone and Gramer came face to face and Gramer ordered Ragnone to put the helicopter away. Twice, Ragnone pushed Gramer backwards on his chest and told him to get out of his face. On the following June 28, Gramer terminated Ragnone, for the stated reason that Ragnone struck him.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. *Robi v. Reed,* 173 F.3d 736, 739 (9th Cir.), *cert. denied,* 528 U.S. 952, 120 S.Ct. 375, 145 L.Ed.2d 293 (1999).

## DISCUSSION

I. *Overtime*

A. *Exempt Status*

Ragnone moves for partial summary judgment of liability on his overtime claims under federal law. He contends that he is not an exempt employee and, thus, should have been compensated for all of the time that he was on-call, 24 hours a day, seven days a week, throughout his employment other than during his vacations. Defendants move for summary judgment against both wage claims, contending that Ragnone is an exempt employee.

Generally, the Fair Labor Standards Act ("FLSA") requires employees to be paid time and a half for all hours worked in excess of 40 hours a week. 29 U.S.C. § 207(a)(1). It also provides several categories of jobs for which the employees are exempt from overtime provisions. Defendants contends that Ragnone falls within the exemption for bona fide professionals, also known as "learned professionals." *Id.* § 213(a)(1); ORS 653.020(3)[1]. The "short test" can be used to determine if an employee is a bona fide professional when the person is compensated on a salary basis of at least $250 per week. That is the case with Ragnone. Thus, I need to determine if his primary duty is performance of the following:

Work requiring knowledge of an advance[d] type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and

---

1. The state law is very similar to the federal law. *See* OAR 839–020–0004, –0005, –0030. I will analyze both together.

from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes .... 29 C.F.R. § 541.3(a)(1). That work must include work requiring the consistent exercise of discretion and judgment. 29 C.F.R. § 541.3(e). The regulations state that the typical symbol of professional training is the appropriate academic degree, frequently an advanced academic degree. Traditional learned professions include law, medicine, nursing, accounting, actuarial computation, engineering, architecture, teaching, and various types of physical, chemical, and biological sciences, including pharmacy. The regulations acknowledge that the areas in which professional exemptions apply may be expanding. 29 C.F.R. § 541.301(e)(1) and (2).

The question of how the employee spends his time is a question of fact. The question of whether particular activities exclude the employee from FLSA overtime benefits is a question of law. *Bratt v.. County of Los Angeles*, 912 F.2d 1066, 1069 (9th Cir.1990), *cert. denied*, 498 U.S. 1086, 111 S.Ct. 962, 112 L.Ed.2d 1049 (1991).

Defendants rely on *Paul v. Petroleum Equipment Tools Co.*, 708 F.2d 168 (5th Cir.1983). The court held that the professional exemption was correctly applied to plaintiff, a company pilot for a twin-engine aircraft. It looked at the Federal Aviation Administration's ("FAA") requirements for plaintiff's commercial license and instrument rating. The pilot's decisions on whether a craft was airworthy, whether it was safe to fly, and the appropriate route all required considerable discretion and judgment. The court considered the training, testing, and flight hours requirements for the two licenses to be extensive. The court also noted that the Wage and Hour Division of the Department of Labor has historically taken no enforcement action concerning commercial pilots of airplanes and helicopters who are paid sufficiently and who fly aircraft as business or company pilots[2]. The court concluded that

plaintiff performed exempt professional work. *Id.* at 171–174.

Ragnone relies on a recent decision from the Administrative Review Board in the Department of Labor, *In re United States Postal Service ANET and WNET Contracts*, 2000 WL 1100166, ARB Case No. 98–131 (2000). As a threshold matter in this Service Contract Act case, the Board had to decide if the pilots of the planes for the Postal Service's air transport contractors were exempt employees under the FLSA regulations. The planes were primarily B727s and DC8s. After studying the regulations, the Board concluded that the training required to become a pilot is not knowledge of an advanced type in a field of science or learning, as required in the regulations. The Board acknowledged that the regulations do not expressly state that a college degree is required, but that all of the examples given require a specialized college or graduate level degree. One exception, for registered nurses, is a shortened, intense, specialized college-type academic program followed by a state examination. *Id.* at *13–14. The Board disagreed with *Paul*, stating that it is "analytically incorrect to 'work backwards' from the level of an employee's knowledge and skill in order to infer that the occupation requires the kind of advanced academic instruction contemplated by the regulations." *Id.* at *14. The Board also gave no weight to the fact that the department historically took no enforcement action, stating that the administrator had never decided that the pilots were exempt and the lack of enforcement could be due to limited prosecutorial resources. *Id.* at *15.

In summary, the Board noted:

Although charged with an extraordinary degree of responsibility, the training of airline pilots in this country typically does not revolve around specialized college-type academic instruction, but more closely resembles the classic apprentice-

---

**2.** $300 per week as of 1975. Opinion Letter, WH–357; Sept. 2, 1975.

ship model—a structured, systematic program of on-the-job supervised training coupled with a program of related instruction.

*Id.* at *16. The Board held that pilots were not exempt under the regulations. *Id.*

■ I agree with the Board that the analysis in *Paul* is incorrect. Although pilots are highly skilled employees, the skill does not come from extensive academic training. The classroom time is quite limited. In comparison, jobs which typically require a college degree are not considered learned professions if the degree is in the nature of general studies. I also realize that Ragnone was more highly paid than the usual nonexempt employee. This is an example of how the FLSA has not been amended to reflect the modern workplace. I conclude that Ragnone is a nonexempt employee.

### B. *On–Call Time*

If defendants lose their argument that Ragnone is an exempt employee, they alternatively argue that he is not entitled to overtime compensation for on-call waiting time, 24 hours a day, seven days a week.

■ Ragnone's claim presents the classic issue of whether he was engaged to wait, and should be compensated, or waiting to be engaged, and should not be compensated. Time spent waiting for work is compensable only if it is spent primarily for the benefit of the employer and its business. *Owens v. Local No. 169*, 971 F.2d 347, 350 (1992) (quotation omitted). Two factors determine whether on-call waiting time is compensable: (1) the degree to which the employee is free to engage in personal activities; and (2) the agreements between the parties[3]. *Berry v. County of Sonoma*, 30 F.3d 1174, 1180 (9th Cir.1994), *cert. denied*, 513 U.S. 1150,

115 S.Ct. 1100, 130 L.Ed.2d 1067 (1995). Whether and to what extent employees can use on-call time for personal activities is a question of fact. Whether the limitations on personal activities are such that on-call waiting time would be considered compensable time under the FLSA is a question of law. *Id.*

A list of factors have been used in analyzing the degree to which an employee is free to engage in personal activities while on-call:

> (1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.

*Id.* at 1183. The list is not exhaustive and no one factor is dispositive. *Id.*

There are no factual issues on any of these factors but the record contains no evidence on the frequency of the calls and what Ragnone actually did while on-call. Ragnone did not have to comply with an on-premises living requirement. There was no geographical restriction on his movement. He did not have a fixed time limit in which to respond but was once chastised for showering before responding to a 6:30 a.m. call. Ragnone could decline to respond and did so a few times. He carried a pager so he was not required to stay at home near his telephone. The only factor weighing in Ragnone's favor is that he could not easily trade on-call responsibilities. Although there was a backup pi-

---

**3.** The Oregon law is similar.

An employee who is required to remain on-call on the employer's premises or so close thereto that he/she cannot use the time effectively for his/her own purposes is working while "on-call". An employee who is not required to remain on the employer's premis-

es but is merely required to leave word at his/her home or with company officials where he/she may be reached is not working while on-call.

OAR 839–020–0041(3). I will apply the same analysis to state and federal law.

lot, the person was not a regular employee who had on-call duties of his own that could be traded off with Ragnone. In summary, although Ragnone was quite dedicated to his job and usually responded to calls, he actually enjoyed a large degree of freedom to engage in personal activities during on-call time.

Agreements between the parties assist in determining whether the parties characterized the time spent waiting on-call as actual work. An agreement calling for some type of compensation for on-call waiting time may suggest the parties characterize the time as work. *Id.* at 1181.

Although defendants paid Ragnone, in half-day increments, for time actually worked outside his normal shift, the agreement did not provide any compensation for the on-call time. Ragnone never complained about this arrangement while still employed. This shows that the parties did not characterize on-call time as actual work.

■ Based on these two factors, I conclude that Ragnone's on-call time was not spent primarily for the benefit of the employer and its business. Consequently, it is not compensable. At trial, Ragnone must prove actual hours worked to be compensated for overtime.

### C. *Statute of Limitations, Liquidated Damages, and Civil Penalty*

These three issues revolve around the concepts of willfulness and good faith, although the definition is different under each statute.

■ Actions enforcing the FLSA must be commenced within two years "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). Willfulness is defined as when the employer either knew or showed reckless disregard for whether its conduct was prohibited by the act. *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). If the employer acts unreason-

ably, but not recklessly, its actions are not willful. *Id.* at 135 n. 13, 108 S.Ct. 1677.

An employer who violates the overtime provisions of the FLSA is liable for an additional equal amount as liquidated damages. 29 U.S.C. § 216(b). Liquidated damages are mandatory unless the employer fails to establish subjective and objective good faith in its violation. 29 U.S.C. § 260. *See Local 246 Utility Workers Union of America v. Southern California Edison,* 83 F.3d 292 (9th Cir. 1996). The employer must establish that it had "an honest intention to ascertain and follow the dictates of the Act and that it had reasonable grounds for believing that [its] conduct complie[d] with the Act." *Id.* at 298 (internal quotation omitted). Even if the employer meets its burden, the court may still award some liquidated damages. *Id.*

Finally, under the Oregon wage laws, an employer that willfully fails to pay wages as required when employment ends is liable for penalty wages. ORS 652.150. Willfulness does not imply blame, but only that the "person knows what he is doing, intends to do what he is doing, and is a free agent." *Nilsen v. Johnston,* 233 Or. 103, 108, 377 P.2d 331 (1962).

■ When Rausch hired Ragnone, he consulted with Kathy Copeland, KGW's human resources manager, and Grant, the general manager, before deciding to classify Ragnone as an exempt employee. Copeland believes that she is generally familiar with FLSA exemptions. The group considered Ragnone's training, experience, job responsibilities, salary, and knowledge of how other stations classified helicopter pilots. There is no evidence that the station was aware of the *Paul* decision or other publications concluding that pilots were nonexempt. The current record is not sufficient to determine these three issues. Summary judgment is denied.

## II. *Wrongful Discharge*

■ The common law tort of wrongful discharge is precluded when an adequate statutory remedy exists. *Walsh v. Consolidated Freightways,* 278 Or. 347, 352–53, 563 P.2d 1205 (1977) (employee terminated for reporting a health violation). Defendants contend that Ragnone had an adequate statutory remedy in ORS 654.062(5)(b):

> Any employee ... who believes that the employee has been barred or discharged from employment ... by any person in violation of this subsection may ... file a complaint with the Commissioner of the Bureau of Labor and Industries .... The affected employee shall also have the right to bring a suit in any circuit court of the State of Oregon against any person alleged to have violated this subsection. The commissioner or the circuit court may order all appropriate relief including rehiring or reinstatement of the employee to the employee's former position with back pay.

The subsection generally discusses employees notifying their employers of safety and health violations:

> Every employee should notify the employer of any violation of law, regulation or standard pertaining to safety and health in the place of employment when the violation comes to the knowledge of the employee.

ORS 654.062(1).

Ragnone makes several arguments. He first contends that ORS 654.062 does not apply because he alleges no conduct prohibited by it. He characterizes his claim as being that his autonomy to make flight decisions under the Federal Aviation Administration ("FAA") regulations was improperly challenged.

■ Ragnone is making a fine distinction but I believe that it is the correct one. He did not notify defendants of any safety violation he saw in the workplace. Rather, he did not fly when he felt it unsafe. Although defendants obviously were notified when Ragnone would not pilot the helicopter, the decision not to fly is not a safety violation. I conclude that ORS 654.062 does not apply to this action.

Defendants make the alternate argument that Ragnone's claim does not fall within the public duty or societal obligation exception for the wrongful discharge tort.

■ Absent a contractual, statutory, or constitutional requirement, the general rule is that an employer may discharge an employee at any time and for any reason. *Patton v. J.C. Penney Co.,* 301 Or. 117, 120, 719 P.2d 854, 856 (1986). Two exceptions exist. The first is when an employee is discharged for fulfilling a societal obligation. *Nees v. Hocks,* 272 Or. 210, 536 P.2d 512 (1975) (employee discharged for serving on jury duty); *Delaney v. Taco Time Intl.,* 297 Or. 10, 681 P.2d 114 (1984) (discharged for refusing to sign a false and arguably tortious statement). The second is when the plaintiff is discharged for pursuing private statutory rights related directly to the employee's role as an employee and of important public interest. *Brown v. Transcon Lines,* 284 Or. 597, 588 P.2d 1087 (1978) (discharged for filing a workers compensation claim).

Defendants distinguish Ragnone's claim from a societal obligation type of wrongful discharge because no one ordered Ragnone to do something illegal or immoral. It notes the difference between Ragnone's allegations and *Anderson v. Evergreen International Airlines, Inc.,* 131 Or.App. 726, 886 P.2d 1068 (1994), *rev. denied,* 320 Or. 749, 891 P.2d 659 (1995). The court held that Anderson alleged a wrongful discharge claim by alleging he was fired for refusing to violate FAA safety regulations and for refusing to participate in defendant's active cover-up. Anderson was told to remove good replacement parts from an aircraft, return the defective parts, and not log the change. *Id.* at 728, 734, 886 P.2d 1068.

■ I acknowledge that the question is a close one but conclude that Ragnone was not terminated for fulfilling a societal obli-

gation. In *Anderson,* the plaintiff was repeatedly ordered to violate the law. He was fired when he refused and would not participate in the cover-up. In deposition, Ragnone admitted that he was never ordered to fly in unsafe conditions, to fly when the helicopter was not air worthy, or to operate the helicopter in a careless or reckless manner. Defendants agree that Ragnone, as pilot, had the final decision on whether to fly. They are within their rights as an employer, however, if they question the reasons for Ragnone's decisions. The issue of when it is safe to fly has a lot of ambiguity. In contrast, the issue of putting defective parts back into planes and failing to log the change cannot be defended. If KGW preferred an aggressive pilot to a conservative pilot, that is the station's decision. The evidence shows that Ragnone refused to fly when he believed it was unsafe, even if questioned by his supervisor.

Summary judgment is granted against the wrongful discharge claim.

## CONCLUSION

Plaintiff's motion for partial summary judgment (# 24) is granted. Defendants' motion for summary judgment (# 44) is granted in part.