# United States Court of Appeals
## For the First Circuit

No. 01-2747

JOHN PLUMLEY,

Plaintiff, Appellant,

v.

SOUTHERN CONTAINER, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]
[Hon. David M. Cohen, U.S. Magistrate Judge]

Before

Selya, Circuit Judge,

Gibson* and Greenberg,** Senior Circuit Judges.

Gerald F. Petruccelli, with whom Petruccelli & Martin, LLP, Francis M. Jackson, and Jackson & MacNichol were on brief, for appellant.
Perry S. Heidecker, with whom Joseph M. Labuda, Milman & Heidecker, James R. Erwin, and Pierce Atwood were on brief, for appellee.

September 13, 2002

_____
*Of the Eighth Circuit, sitting by designation.
**Of the Third Circuit, sitting by designation.

**SELYA**, **Circuit Judge**.  This case poses a question of first impression:  should compensation awarded for work-hours lost during an employee's successful pursuit of a grievance count as "hours of service" within the meaning of the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654 (1994)?  The district court answered this question in the negative and, accordingly, entered judgment in favor of the employer.[1]  We affirm.

## I.  BACKGROUND

We present the facts in the light most favorable to the party opposing summary judgment (here, the plaintiff), consistent with record support.  See McIntosh v. Antonino, 71 F.3d 29, 32 (1st Cir. 1995).

In February of 1996, defendant-appellee Southern Container, Inc. (SCI) hired plaintiff-appellant John Plumley to work at its plant in Westbrook, Maine.  Throughout his tenure, Plumley was part of a bargaining unit represented by Local 669 of the United Paperworkers International Union (the Union).  At all times relevant hereto, SCI and the Union were parties to a collective bargaining agreement (the CBA) that included a standard grievance procedure.  Under it, an employee who believed that he had been treated unfairly by SCI could file a grievance and expect

---

[1]In this instance, the district judge accepted and adopted the detailed report and recommendation of a magistrate judge.  For simplicity's sake, we do not distinguish between the two judicial officers.  Rather, we take an institutional view and refer to the determinations below as those of the district court.

a grievance committee elected by the Union to represent his interests. Any settlement between SCI and the grievance committee would bind the complaining employee. If SCI and the grievance committee could not resolve the dispute amicably, either side could take the matter to arbitration. The CBA stipulated that the parties (and the complaining employee) would be bound by the arbitrator's decision.

Plumley invoked the grievance procedure no fewer than seven times during his tour of duty with SCI. One such occasion followed his discharge on March 21, 1998. The ensuing dispute reached the arbitration stage. Finding that the sanction imposed was overly harsh, the arbitrator vacated the dismissal in favor of a two-week suspension without pay. Ancillary to this determination, the arbitrator ordered SCI to compensate Plumley in full for the wages and benefits that he had lost during the period when his grievance was being processed (adjusted for the two-week suspension). Plumley received these emoluments — wages and benefits for a span of approximately six months — despite the fact that he had not worked for SCI during that interval.

The plant manager, Leo Parenteau, learned of the arbitral award on October 5, 1998. The next day, he sent Plumley a registered letter directing him to return to work on October 12. Plumley received the letter on October 7, but found the timing

inconvenient.[2]  He requested a brief delay, but Parenteau remained resolute.

On October 12, Plumley reported to work at SCI, but departed before completing his shift.  The next day, he left a message stating that he would be either late or absent because he needed to see his ill father.  Plumley did not report to work at all, but, rather, visited his father at a hospital in Boston.  When Plumley arrived at the plant on October 14, Parenteau cashiered him for abandoning his duties.  Plumley attempted to grieve the firing but the Union elected not to submit his grievance to arbitration.

So goes a rote story in modern labor-management relations – facts as routine as they are simple.  The atypicality of this case is not apparent until certain elements are viewed through the prism of the FMLA, a federal statute that "entitle[s eligible] employees to take reasonable leave for medical reasons . . . [including] the care of a child, spouse, or parent who has a serious health condition . . . ."  29 U.S.C. § 2601(b)(2).  The statute allows such employees to take up to twelve weeks of unpaid leave for specified reasons during any twelve-month period without jeopardizing their employment security.  Id. § 2612.  It defines an eligible employee as one "who has been employed (i) for at least 12

_____

[2]After his discharge, Plumley had started working full-time at a nightclub in which he held an ownership interest.  He complained to Parenteau that the October 12 recall gave him only two business days to arrange coverage at the club.  Parenteau was unmoved by Plumley's plight.

months by the employer with respect to whom leave is requested . . .; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period."  Id. § 2611(2)(A).

Seizing upon this language, Plumley filed suit against SCI in Maine's federal district court, alleging that SCI violated the FMLA and the Labor Management Relations Act (LMRA), 29 U.S.C. §§ 141-197 (1994), when it terminated his employment on October 14, 1998.[3]  SCI denied the material allegations of the complaint.  In due season, Plumley moved for summary judgment.

In his motion, Plumley contended that he met the requirements for FMLA eligibility because he had worked full-time for SCI for more than one year and had provided more than 1,250 hours of service during the twelve months preceding the leave request.  He arrived at the total number of hours by aggregating 851.25 hours actually worked up to March 21 (the date when he had been improvidently discharged) and the hours for which he was compensated under the arbitral award.  In Plumley's estimation, those hours — which corresponded generally to the work weeks from March 22 to October 11, 1998, minus the two-week suspension approved by the arbitrator — were, as a matter of law, hours of service within the compass of the FMLA (and, thus, brought his

_____

[3]Plumley originally joined the Union as an additional defendant, charging that the Union violated the LMRA when it did not press his grievance.  He subsequently dropped the Union as a defendant, and the Union is not a party to this appeal.

aggregate hours of service well over 1,250 for the relevant twelve-month period). Building on this foundation, he asseverated that SCI had violated the FMLA by firing him for taking leave to care for his ailing father. In the alternative, he theorized that SCI should be estopped from disputing his eligibility for coverage under the FMLA. Finally, he maintained that he had a right under the LMRA to recover from SCI since the Union had breached its duty of fair representation (DFR) by not submitting his grievance to arbitration.

SCI opposed this motion and simultaneously cross-moved for summary judgment, emphasizing that Plumley actually had worked fewer than 1,250 hours in the previous twelve months and thus did not meet the criteria for FMLA eligibility. In SCI's view, this fact scuttled both the FMLA and DFR claims. The district court entered summary judgment in favor of SCI. This appeal followed.

## II. ANALYSIS

The role of summary judgment is to look behind the facade of the pleadings and assay the parties' proof in order to determine whether a trial is required. McIntosh, 71 F.3d at 33. In conventional summary judgment practice, the moving party has the initial responsibility of suggesting the absence of a genuine issue of material fact. Quintero de Quintero v. Aponte-Roque, 974 F.2d 226, 227-28 (1st Cir. 1992). That entails supporting the motion, by affidavits, admissions, or other materials of evidentiary

-6-

quality, as to issues on which the movant bears the burden of proof. McIntosh, 71 F.3d at 33. Once the movant has fulfilled this obligation, the burden shifts to the summary judgment target to demonstrate that a trialworthy issue exists. Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000). In the last analysis, summary judgment is appropriate only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

This same paradigm governs our de novo review of a district court's grant of summary judgment. See Suarez, 229 F.3d at 53. That non-deferential mode of review is particularly appropriate where, as here, a case turns on a question of statutory interpretation. See Riva v. Commonwealth of Mass., 61 F.3d 1003, 1007 (1st Cir. 1995) (explaining that rulings that depend on statutory construction engender de novo review). It is against this backdrop that we ponder Plumley's asseverational array.

## A. The FMLA Claim.

As the parties readily concede, the central issue in this appeal presents a pure question of law: the interpretation of the "hours of service" requirement of the FMLA. The record is pellucid that Plumley performed only 851.25 hours of actual physical work for SCI in the twelve-month period prior to the date when he

-7-

absented himself to visit his ailing father. In the first instance, then, Plumley's case stands or falls on the classification of the hours that he did not actually work but for which he was compensated under the arbitral award. If those hours comprise hours of service within the purview of the FMLA, then Plumley has demonstrated his eligibility for FMLA benefits (and, therefore, his action should have survived a motion for summary judgment). If, however, those hours do not count for FMLA purposes, then Plumley was not eligible for FMLA benefits (and, therefore, his action was ripe for <u>brevis</u> disposition).

The district court interpreted the FMLA as excluding the hours in question and entered judgment accordingly. We test this determination.

In plotting the contours of a statute, courts must look first to its language and structure. <u>Lopez-Soto</u> v. <u>Hawayek</u>, 175 F.3d 170, 172 (1st Cir. 1999); <u>United States</u> v. <u>Charles George Trucking Co.</u>, 823 F.2d 685, 688 (1st Cir. 1987). Thus, statutory interpretation always begins with the text of the relevant statutes — and it sometimes ends there as well. When the statutory language "points unerringly in a single direction, and produces an entirely plausible result, it is unnecessary – and improper – to look for other signposts or to browse in the congressional archives." <u>Charles George Trucking</u>, 823 F.2d at 688.

With these precepts in mind, we examine the statutory provisions at issue here. The FMLA instructs us that "[f]or purposes of determining whether an employee meets the hours of service requirement . . . , the legal standards established under section 207 of [Title 29] shall apply." 29 U.S.C. § 2611(2)(C). Section 207 is part of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219 (1994). The applicable subsection deals with pay classifications. It states that the "'regular rate' at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee . . . ." Id. § 207(e).

The phrase "for employment" is critically important. To ensure needed guidance, the FMLA, in 29 U.S.C. § 2611(3), refers courts to FLSA § 203(g) for the definition of "employ" (the root of "employment"). That section provides that "'[e]mploy' includes to suffer or permit to work." Because this phrase is open-ended — "includes" is not all-encompassing — we must broaden our search for the meaning of the words that Congress wrote.

We conduct this inquiry with a keen awareness of the general principle that, absent credible evidence to the contrary, courts should assume that Congress knew, and embraced, widely accepted legal definitions of specific words used in drafting particular statutes. United States v. Nason, 269 F.3d 10, 16 (1st Cir. 2001). That principle bears fruit in this instance. For

legal purposes, the standard definition of "employment" is "[w]ork for which one has been hired and is being paid by an employer." Black's Law Dictionary 545 (7th ed. 1999). By like token, the word "work" is defined in its verb form as "[t]o exert effort; to perform, either physically or mentally." Id. at 1599. Merging these definitions into one coherent sentence, we find that the statutory language, in every technical sense, indicates that only those hours that an employer suffers or permits an employee to do work (that is, to exert effort, either physically or mentally) for which that employee has been hired and is being paid by the employer can be included as hours of service within the meaning of the FMLA.

To end our analysis here would truncate the process, for the task of statutory construction often is informed by reading the whole of the statute. Acadia Ins. Co. v. McNeil, 116 F.3d 599, 604 (1st Cir. 1997). This case is no exception: other language in FLSA § 207 strongly supports the conclusion that hours of service must be limited to hours actually worked at the behest of the employer. We explain briefly.

FLSA § 207(e) contains a list of remunerations that the regular rate "shall not be deemed to include." This compendium encompasses such things as "reward[s] for service, the amount of which are not measured by or dependent on hours worked, production, or efficiency [and] payments made for occasional periods when no

-10-

work is being performed due to vacation, holiday, illness, failure of the employer to provide sufficient work, or other similar cause." 29 U.S.C. § 207(e)(1)-(2). These exclusions (and the statutory language used in their explication) illustrate that any compensation that is not paid for hours actually worked in the service and at the gain of the employer is not to be counted toward hours of service. It is surpassingly difficult to make a principled distinction between wages received for hours not worked because an employer has failed to provide sufficient work and wages received for hours not worked because an employer unjustifiably has kept the employee from working (and, thus, has failed to provide sufficient work).

Plumley demurs. Represented by able counsel, he argues that the arbitral award can be distinguished from the exemplars listed in FLSA § 207(e) on the basis that all the listed items provide some benefit to the employee, whereas a wrongfully discharged employee – even one who subsequently prevails at arbitration – does not benefit at all from his mistreatment. This characterization is of doubtful validity; as this case illustrates, a wrongfully discharged employee who prevails at arbitration receives not only reinstatement but also the wages that he would have earned even though he has not performed the services to which those wages relate. In that sense, the wrongfully discharged

employee benefits to the same extent as the employee who, say, is paid for down time.

In all events, Plumley's characterization, even if accurate, adds no dimension to our analysis. Congress directed courts to use the "legal standards established under section 207 of [the FLSA]" in order to determine the way in which hours of service should be measured. 29 U.S.C. § 2611(2)(C). One of these standards, enunciated long ago by the Supreme Court, is that "work" for purposes of the FLSA means "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and <u>primarily for the benefit of the employer</u> . . . ." <u>Tennessee Coal, Iron & R.R. Co.</u> v. <u>Muscoda Local No. 23</u>, 321 U.S. 590, 598 (1944) (emphasis supplied). Our derivation of the statutory language comports with this definition.[4] Moreover, Plumley cites no precedent under the FLSA in which an adjudication hinged upon whether the employee was (or

_____

[4]We recognize, of course, that the extent of exertion involved carries little legal weight, because "an employer, if he chooses, may hire [one] to do nothing, or to do nothing but wait for something to happen." <u>Armour & Co.</u> v. <u>Wantock</u>, 323 U.S. 126, 133 (1944). Nevertheless, the quoted language from <u>Tennessee Coal</u> has withstood the test of time, and constitutes the yardstick by which claims under the FLSA are measured. <u>See</u> <u>United Transp. Union Local 1745</u> v. <u>City of Albuquerque</u>, 178 F.3d 1109, 1116 (10th Cir. 1999); <u>Dunlop</u> v. <u>City Elec., Inc.</u>, 527 F.2d 394, 401 (5th Cir. 1976); <u>Secretary of Labor</u> v. <u>E.R. Field, Inc.</u>, 495 F.2d 749, 751 (1st Cir. 1974); <u>Karr</u> v. <u>City of Beaumont</u>, 950 F. Supp. 1317, 1321-22 (E.D. Tex. 1997).

was not) benefitted by the employer's payment. This lack of citation is understandable.

The case law shows, consistent with Tennessee Coal, that courts faced with scenarios not clearly anticipated by Congress have looked primarily to whether the employer was benefitted to determine if particular hours are covered under FLSA § 207. See, e.g., Richardson v. Costco Wholesale Corp., 169 F. Supp. 2d 56, 61 (D. Conn. 2001) (holding that employee's time spent in "lock-in collection procedure" does not constitute work under the FLSA because not integral to employer's business activities); Ragnone v. Belo Corp., 131 F. Supp. 2d 1189, 1194-95 (D. Or. 2001) (determining that pilot's on-call time was not spent primarily for the benefit of the employer and its business and thus did not constitute actual hours worked under the FLSA); cf. Dinges v. Sacred Heart St. Mary's Hosp., Inc., 164 F.3d 1056, 1059 (7th Cir. 1999) (reasoning that emergency medical technician's on-call time is not work under the FLSA). Consequently, we decline Plumley's invitation to determine which hours are covered hours of service based upon the benefit inuring to the employee rather than the benefit inuring to the employer.

Plumley also argues that FLSA § 207 works by exclusion, necessitating the inclusion of all compensation (and, therefore, all hours of service) not explicitly described in one of its subsections. The fatal flaw in this construct is that it reads the

limiting phrase "for employment" out of the text of the statute. It is black-letter law that all words in a statute are presumed to have meaning and should be given full effect when feasible. E.g., United States v. Victoria-Peguero, 920 F.2d 77, 81 (1st Cir. 1990); United States v. Ven-Fuel, Inc., 758 F.2d 741, 751-52 (1st Cir. 1985). The words "for employment" fit naturally into the rhythm of FLSA § 207. Those words inform courts what remunerations to include in calculating an employee's "regular rate," and, by incorporation, his hours of service under the FMLA.[5]

Because Congress imported FLSA § 207 into the FMLA, a thorough analysis requires us to ensure that our interpretation of § 207, when transplanted into the soil of the FMLA, produces a plausible result. See Charles George Trucking, 823 F.2d at 688. We turn next to that task.

The stated purposes of the FMLA are "(1) to balance the demands of the workplace with the needs of families . . . ; (2) to entitle employees to take reasonable leave for medical reasons . . . ; [and] (3) to accomplish the[se] purposes . . . in a manner that

---

[5]To be sure, "remuneration" is customarily defined as the act of paying "a suitable equivalent in return for goods provided, services rendered, or losses incurred; recompense." American Heritage Dictionary of the English Language 1476 (4th ed. 2000) (emphasis supplied). Under this definition, the arbitral award reasonably could be characterized as payment for losses incurred. We are not free, however, to choose this course. Rather, we must give effect to the statutory text as Congress wrote it. Viewed through that lens, the arbitral award cannot be considered payment for services rendered.

-14-

accommodates the legitimate interests of employers . . . ." 29 U.S.C. § 2601(b)(1)-(3). We see nothing odd about the fact that Congress chose to strike this balance by defining eligible employees as those who have worked for the employer during the previous twelve months and have contributed 1,250 hours of actual work. Indeed, if Congress chose to exclude periods when the employer fails to provide sufficient work – a scenario completely at the fault of the employer and out of the control of the employee – we cannot deem it implausible that Congress would want to exclude for FMLA purposes unproductive time elapsed during the pendency of a grievance.

Plumley's back-up argument is that the intent of Congress in requiring 1,250 hours of service was to insulate employers from having to extend FMLA coverage to part-time workers. Building on this foundation, he exhorts us to overlook the text of the statute and find that Congress intended to cover all full-time employees. But the foundation for this exhortation is porous: Congress chose to differentiate eligible employees from ineligible employees by the number of hours worked in the previous twelve months. See S. Rep. No. 103-3, at 23 (1993), reprinted in 1993 U.S.C.C.A.N. 2, 25 (explaining that "the bill does not cover part time or seasonal employees working less than 1,250 hours a year"). Because we already have determined that Plumley did not actually work the requisite number of hours, the plain letter of the law excludes him

-15-

from coverage under the FMLA.[6]  Were we to hold otherwise, we would usurp Congress's policypicking role, and, in the bargain, threaten both the delicate statutory balance that Congress sought to achieve and the constitutional balance envisioned by the Founders.  Cf. Victoria-Peguero, 920 F.2d at 81 (declaring this court's resolve to refrain from "substitut[ing] judicial judgment for legislative judgment or . . . plac[ing] limitations on [statutory language] which were not envisioned by Congress").

We summarize succinctly.  Our appraisal of the text and structure of the FMLA, together with the incorporated provisions of the FLSA, discloses unambiguous language leading to an entirely plausible result.  Thus, we hold that hours of service, as those words are used in the FMLA, include only those hours actually worked in the service and at the gain of the employer.  It follows inexorably that compensation resulting from an arbitral award, in the nature of back pay for wrongful discharge, falls outside the statutory ambit.[7]

---

[6]In arguing for a contrary conclusion, Plumley's counsel asserted at oral argument that this court should regard the FMLA as a remedial statute designed to protect employees.  But this is an oversimplification.  The FMLA is a carefully calibrated compromise that balances the legitimate interests of both employers and employees.  See 29 U.S.C. § 2601(b).  As part of this compromise, it provides benefits only to eligible employees.  This eligibility is the very issue in dispute here.

[7]In his reply brief, Plumley argues for the first time that SCI violated 29 U.S.C. § 2615(a)(1) (a statute that renders it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under

## B.  <u>The Estoppel Claim</u>.

Plumley launches a related attack:  he contends that SCI should be estopped from disputing his FMLA eligibility.  His principal reliance is on the doctrine of collateral estoppel.  That reliance is misplaced.

Under federal law, a party wishing to invoke the doctrine of collateral estoppel must establish (1) that the issue to be precluded is the same as that disputed in a prior proceeding, (2) that the issue was actually litigated in the earlier proceeding, (3) that the issue was determined by a valid and binding final judgment or order, and (4) that the determination of the issue in the prior proceeding was essential to the final judgment or order. <u>Faigin</u> v. <u>Kelly</u>, 184 F.3d 67, 78 (1st Cir. 1999).  Here, Plumley claims that the district court stripped a final order — the arbitral award — of its full effect by not counting the wages paid thereunder towards FMLA eligibility.  This claim is unavailing: the record contains no evidence that the FMLA was mentioned, let alone adjudicated, in the arbitration proceeding.  We conclude,

---

[the FMLA]").  Neither this statute nor the related regulation, 29 C.F.R. § 825.220(b)(3), were cited to the district court or in the appellant's opening brief.  Consequently, the argument is twice forfeited.  <u>See</u> <u>Teamsters Local No. 59</u> v. <u>Superline Transp. Co.</u>, 953 F.2d 17, 21 (1st Cir. 1992) (explaining that arguments not advanced in the district court cannot be raised for the first time on appeal); <u>Sandstrom</u> v. <u>ChemLawn Corp.</u>, 904 F.2d 83, 86-87 (1st Cir. 1990) (explaining that arguments not asserted in an appellant's opening brief cannot be raised for the first time in his reply brief).

therefore, that the issue of FMLA eligibility was not before the arbitrator, was not litigated in the arbitration, and was neither determined by the award nor essential to its efficacy.

Plumley tries to blunt the force of this reasoning by insisting that the arbitrator, in reinstating him to full seniority, preserved his rights under the FMLA and necessarily implied that his hours of service should be credited for that purpose. This argument is refuted by the CBA's definition of "seniority."

The CBA states in relevant part that the purpose of the article anent seniority "is to provide an equitable measure of job security and promotional opportunity based on the length of service for all employees in the Bargaining Unit." That article defines seniority as "continuous service within the Plant" and declares that the seniority principle "shall be applied in cases of layoff, recall[,] and transfer to an opening in another department."

From these provisions, it is plain that the CBA establishes the relative length of employee service as a determining factor when employees compete for jobs, promotions, and other scarce resources. But FMLA eligibility is not doled out to one employee at the expense of another. It is afforded to as many employees as meet the eligibility criteria in amounts limited only by the statute itself. Consequently, the CBA's concerns relating to seniority do not affect — and are not affected by — FMLA

eligibility.  Thus, Plumley's collateral estoppel claim fails because the arbitrator's reference to seniority cannot plausibly be interpreted as incorporating statutory rights under the FMLA.

This holding also disposes of Plumley's related argument that the lower court should have given the arbitral award preclusive effect in accordance with the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-16 (1994).  If more were needed — and we do not think that it is — that argument is based on a faulty premise: that the Union had the authority to arbitrate a binding agreement on the dimensions of Plumley's statutory rights under the FMLA.

For the most part, statutory rights conferred by Congress upon individual workers cannot be consigned to the grievance procedures created under collective bargaining agreements.  See Pryner v. Tractor Supply Co., 109 F.3d 354, 363 (7th Cir. 1997) (discussing individual rights under Title VII).  This tenet applies to statutory rights created under the FMLA.  See Bonilla v. Small Assemblies Co., 2001 WL 630969, at *4, 80 Empl. Prac. Dec. ¶ 40,609, 143 Lab. Cas. ¶ 34,276 (N.D. Ill. 2001).  If unions were so empowered, the rights of a minority (each individual union member) would be subject to the will of the majority.

This gets the grease from the goose.  If a union cannot arbitrate a binding agreement for an individual worker regarding statutory rights, an arbitration proceeding undertaken pursuant to the CBA cannot yield a final judgment or order binding the employer

-19-

on that issue.  Thus, the FAA estoppel argument also fails the third element of the collateral estoppel test.

Finally, Plumley argues that SCI should be equitably estopped from denying his FMLA eligibility.  This argument flows from his insistence that SCI communicated to him a false proposition, namely, that he was being terminated properly.  He claims that he relied upon this false proposition and did not appear for work, thereby forfeiting his FMLA eligibility.  This construct was only vaguely hinted at below, and for that reason is likely forfeit.  See Teamsters Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992).  More fundamentally, it twists equitable estoppel doctrine into a shape that the law does not recognize.

Simply stated, equitable estoppel prevents one "from denying the consequences of his conduct where that conduct has been such as to induce another to change his position in good faith or such that a reasonable man would rely upon the representations made."  Clauson v. Smith, 823 F.2d 660, 662 (1st Cir. 1987) (citations and internal quotation marks omitted).  It requires that (1) the party to be estopped must know the facts; (2) that party must intend that his conduct be acted upon (or must act in a way that leads the party asserting the estoppel to believe it is so intended); (3) the latter must be ignorant of the true facts; and

-20-

(4) he must rely on the estopping conduct to his detriment.  Id. at 661.

This body of law does not help Plumley because it clearly presupposes that the person invoking the doctrine had a choice of actions to take and, of his own volition, changed position based on the conduct of, or representations made by, the other party.  Here, however, Plumley had no such options.  He was discharged, and could not thereafter have engaged in hours of service accountable under the FMLA.  Moreover, the record makes manifest that Plumley did not rely on SCI's representation as to the propriety of the discharge.  To the contrary, he fought that action tooth and nail.  For these reasons, the doctrine of equitable estoppel is inappropriate.

## C.  **The LMRA Claim**.

We are left with the LMRA claim.  In the last analysis, however, this claim depends on the viability of Plumley's FMLA claim.  To understand why, it is necessary to explain the structure of hybrid DFR claims.

The Supreme Court has made it clear that an "employee may bring an action against his employer . . . , provided the employee can prove that the union . . . breached its duty of fair representation in its handling of the employee's grievance."  Vaca v. Sipes, 386 U.S. 171, 186 (1967).  A union can breach this duty if its "conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith."  Id. at 190.

Because an individual employee does not have an unfettered right to have each and every grievance taken to arbitration, the mere failure to take a dispute to arbitration does not establish liability. Id. at 191-92. If, however, the union fails to take a meritorious claim to arbitration, that failure may transgress the duty of fair representation. See Vaca, 386 U.S. at 191; Laurin v. Providence Hosp., 150 F.3d 52, 62 (1st Cir. 1998); Sarnelli v. Amalgamated Meat Cutters and Butcher Workmen, 457 F.2d 807, 808 (1st Cir. 1972) (per curiam).

This algorithm means that to succeed on his LMRA claim Plumley must establish that he had a meritorious claim that the Union handled in a perfunctory manner, or that the Union's conduct toward him was otherwise arbitrary, discriminatory, or in bad faith. The only argument that Plumley offers to support his DFR count is that the Union arbitrarily refused to take his FMLA claim to arbitration. As the FMLA claim is devoid of merit, see supra Part II(A), the DFR count lacks any visible means of support. After all, Plumley had no absolute right to arbitration of his grievance, and his bare complaint that the Union disposed of his grievance contrary to his desire does not establish a DFR breach.

We will not paint the lily. Plumley has offered no significantly probative evidence to show that the Union breached its duty of fair representation. That evidentiary gap absolves SCI, for an employer cannot be liable on a DFR claim unless the

union too is liable.  <u>Vaca</u>, 386 U.S. at 186.  Accordingly, the district court appropriately entered summary judgment for SCI on this claim.  <u>See</u> <u>Suarez</u>, 229 F.3d at 53.

## III.  CONCLUSION

We need go no further.  Although we are neither insensitive to the equities at stake in this situation nor unmindful of the tug of competing considerations, justice hones its edges on hard cases.  On which side of this edge employees such as Plumley fall is a legislative choice, for it is Congress's mission to set the policy of positive law.  Our role is to interpret that law with precision and predictability.  When Congress facilitates our task by enacting a detailed statutory framework, we must follow its lead.

**<u>Affirmed</u>**.