# United States Court of Appeals
## For the First Circuit

No. 06-2508

UNITED STATES OF AMERICA,

Appellee,

v.

GARY BROWN, A/K/A ANTHONY GREEN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Howard, Circuit Judge,
Selya, Senior Circuit Judge,
and Dyk,* Circuit Judge.

Scott J. Lynch, with whom Hornblower Lynch Rabasco & Vandyke, P.A., was on brief for appellant.
F. Mark Terison, Senior Litigation Counsel, with whom Paula D. Silsby, United States Attorney, was on brief for appellee.

August 22, 2007

*Of the Federal Circuit, sitting by designation.

**SELYA**, <u>Senior Circuit Judge</u>. A jury convicted defendant-appellant Gary Brown of possessing a controlled substance with intent to distribute. On appeal, the defendant challenges his conviction on two grounds, one relating to the denial of his pretrial motion to suppress and the other relating to the exclusion of certain evidence at trial. He also challenges his mandatory minimum life sentence, raising an apparent issue of first impression as to whether, for purposes of 21 U.S.C. § 841(b)(1), "attempt" offenses are considered "felony drug offenses" (and, therefore, may count as predicate offenses on which to base a recidivist sentencing enhancement). Discerning no error in the district court's handling of these various matters, we affirm the judgment below.

## I.  BACKGROUND

We rehearse here only those facts necessary to place this appeal in perspective.

On July 7, 2005, Kevin Cashman, a Lewiston police officer assigned to the Maine Drug Enforcement Agency (MDEA), received a tip about an imminent narcotics transaction. Although Cashman's confidential informant (the CI) had been cooperating with the MDEA for less than a week, he already had provided Cashman with trustworthy information about sellers, transporters, and users of drugs in the Portland area.

The substance of the tip was as follows. The CI told Cashman that a black male known as "Pink" traveled weekly by bus from New York City to Maine to peddle between ten and twenty ounces of crack and powdered cocaine. He further stated that Pink's usual praxis was to stay in a hotel off the Maine Turnpike. The room that he used would be rented under the name of Tanguay (David or Peter). The CI explained that David Tanguay was currently incarcerated and that his brother, Peter, sometimes used David's identification. Other than skin color, the CI provided no physical description of the putative drug peddler.

The CI subsequently advised Cashman that "Pink" had arrived in Portland and was staying in a hotel near the Maine Turnpike. Cashman and another officer proceeded to the Ramada Inn, off former Exit 8 of the Maine Turnpike, and learned that room 127 had been rented in the name of David Tanguay. Comparison of the signatures on the registration form and the identification used in renting the room revealed marked discrepancies.

Cashman called a police dispatcher and corroborated David Tanguay's current status as a federal prison inmate. The officers then obtained access to a room diagonally across from room 127 and conducted a five-hour stake-out. While they observed a black man go in and out of room 127, limitations on their surveillance capabilities rendered them unable to identify the man.

Three weeks later, the CI told Cashman that Pink was en route to Portland on board a Vermont Transit bus from New York City. He said that the wayfarer would arrive that afternoon and would be picked up at the bus station by Peter Tanguay. Tanguay would be driving an old green pick-up truck, plate number 760-409, belonging to the CI. The CI assured Cashman that Pink would be transporting his wonted wares. He explained that he was privy to this information because he had spoken with Peter Tanguay when the latter asked to borrow his truck.

In response to this lead, Cashman called in a fellow officer, who searched both the CI and his truck to ensure the absence of any preexisting contraband. The CI drove away and the officers tailed the truck. They saw Peter Tanguay enter it. After the truck made several stops, Tanguay drove away alone. The officers continued to follow the truck until it reached the bus terminal.

At 3:30 p.m., the officers saw a Vermont Transit bus arrive from New York City. They watched a black man alight carrying two large duffel bags. The man walked to the truck, placed the duffel bags in the cab, and climbed aboard.

By prearrangement, two Portland police cruisers converged on the truck a short distance from the bus terminal. Officer Robert Bickford directed the passenger to disembark, frisked him, and asked for his name and date of birth. The passenger identified

himself as Anthony Green, gave a date of birth, and claimed to be from Boston. He appeared older than the proffered date of birth suggested. Moreover, he professed to have no identification and, when asked how to spell his name, he hesitated.

Bickford tried unsuccessfully to verify the passenger's stated identity using the computer in his cruiser. He eventually asked the man for his social security number, but "Green" said that he did not remember it. When Cashman showed up, he inquired as to the ownership of the duffel bags. Tanguay claimed ownership and Green, in an apparent effort to substantiate that claim, stated that the bags had been in the truck when he arrived. The surveilling officers knew that statement to be untrue.

The officers (whom the magistrate judge credited) asserted that throughout this exchange Green was constantly looking around, as if looking for a way to escape. When asked a second time for identification, he tried to peer into Bickford's notebook, as if trying to recollect the name that he had given.

A canine unit arrived at the scene around thirty minutes after the stop was effected. A trained "drug dog" reacted to a scent emanating from the cab of the truck and, later, alerted to one of the duffel bags. The bag was found to contain 340 grams of crack cocaine as well as numerous small bags of marijuana. A search of the truck's glove compartment revealed additional cocaine. Both the driver (Peter Tanguay) and the passenger were

arrested. Police subsequently identified the passenger as Gary Brown.

On August 25, 2005, a federal grand jury returned a one-count indictment charging the defendant with possessing 50 grams or more of a mixture or substance containing cocaine base on July 29, 2005, with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Early in the case, the defendant moved to suppress all the evidence acquired at the scene of the roadside stop. The district court referred that motion to a magistrate judge.

After conducting an evidentiary hearing, the magistrate judge found the stop, the ensuing searches, and the defendant's arrest justified. See United States v. Brown, Crim. No. 05-70, 2006 WL 149031, at *4-7 (D. Me. Jan. 17, 2006). In his view, the information provided by the CI possessed sufficient indicia of reliability to support stopping the truck, id. at *5; the defendant lacked standing to challenge the search of either the truck or the duffel bags, id. at *6; and the police had probable cause to effect a warrantless arrest, id. at *7.

The defendant objected to the magistrate judge's factual findings and legal conclusions. The district court nonetheless adopted the report and recommendation and denied the motion to suppress. United States v. Brown, Crim. No. 05-70 (D. Me. Feb. 14, 2006).

-6-

Following a trial, a jury found the defendant guilty.  The court sentenced him to life in prison as a career offender.  This timely appeal ensued.

## II.  ANALYSIS

On appeal, the defendant assigns error to the denial of his pretrial motion to suppress, the exclusion of certain evidence at trial, and the sentence imposed.  We consider these assigned errors sequentially.

### A.  **Motion to Suppress**.

When reviewing a district court's disposition of a motion to suppress, we accept the court's findings of fact unless they are clearly erroneous and subject its conclusions of law (including its ultimate conclusions as to constitutionality) to de novo review. Ornelas v. United States, 517 U.S. 690, 699 (1996); United States v. Coplin, 463 F.3d 96, 100 (1st Cir. 2006).  Here, the suppression motion challenged the constitutionality of both the initial traffic stop and the subsequent arrest.  Consequently, we address those two components separately.

**1.  The Stop**.  The Fourth Amendment protects persons from unreasonable searches and seizures.  U.S. Const. amend. IV.  The protection against unreasonable seizures extends to investigatory stops, including vehicle stops.  See Delaware v. Prouse, 440 U.S. 648, 653 (1979); United States v. Chhien, 266 F.3d 1, 5 (1st Cir. 2001).  Passengers in a motor vehicle subjected to a traffic stop

-7-

are deemed seized for Fourth Amendment purposes and, thus, are entitled to challenge the constitutionality of the stop. See Brendlin v. California, 127 S. Ct. 2400, 2406-07 (2007).

In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court established the baseline test for determining the constitutionality of such detentions. Police officers may lawfully effect an investigatory stop as long as they can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" such an intrusion. Id. at 21; see United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004).

While the reasonable suspicion standard requires more than a visceral hunch about the presence of illegal activity, it requires less than probable cause. Chhien, 266 F.3d at 6. By the same token, reasonable suspicion can flourish in the absence of a direct evidentiary link between the suspect and the suspected crime. See United States v. Cortez, 449 U.S. 411, 417-18 (1981).

In practice, then, the constitutional validity of a stop must be evaluated through a broad-based consideration of all the attendant circumstances. See Florida v. Royer, 460 U.S. 491, 500 (1983); Chhien, 266 F.3d at 6. In this process, the circumstances underlying the stop "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." Cortez, 449 U.S. at 418.

Here, the defendant contends that the police lacked a reasonable and articulable basis for the roadside stop because they relied exclusively on a tip provided by an unproven informant. Courts have paid close attention to the use of informants' tips. Even though such tips comprise an important weapon in the armamentarium of law enforcement, see, e.g., Illinois v. Gates, 462 U.S. 213, 237-38 (1983), their use entails a risk that police action may be predicated on malicious or unfounded reports. Thus, if informant information is to provide reasonable suspicion sufficient to ground an investigatory stop, it must possess adequate indicia of reliability. Alabama v. White, 496 U.S. 325, 332 (1990).

The reliability inquiry — like the reasonable suspicion inquiry itself — must be made in light of the totality of the circumstances. Gates, 462 U.S. at 230. While "an informant's 'veracity,' 'reliability,' and 'basis of knowledge' are all highly relevant in determining the value of [an informant's] report," these elements "should [not] be understood as entirely separate and independent requirements to be rigidly exacted in every case." Id.

In this instance, the CI was not a model citizen — he sported a criminal record and unresolved state criminal charges were looming. The defendant asserts that the police knew little or nothing more about the CI. He adds that, although no money had been offered or explicit promises made, the CI obviously expected a good

reference from the officers to the local district attorney as a quid pro quo for the tip.

This assertion understates what the police knew and when they knew it. For one thing, the CI was not anonymous.[1] Since he was known to the police, he could have been held accountable if his information proved inaccurate or false. Cf. Adams v. Williams, 407 U.S. 143, 146-47 (1972) (suggesting that informant's reliability was buttressed by the fact that he risked prosecution should he make a false report). For another thing, at the time of the tip that prompted the arrest, the CI had been cooperating with the authorities for approximately one month. During that period, Cashman had several interactions with him. Moreover, even prior to July 7, the CI had provided trustworthy information and had demonstrated his knowledge of the drug trade in the Portland area. Thus, by July 29 the CI had compiled some record of reliability.

To be sure, factors like an informant's prior criminal record and desire to advantage himself with respect to pending criminal charges are to be considered in evaluating his reliability. But such considerations are not dispositive. The fact of the matter is that those who possess information about the inner workings of the drug trade are unlikely to be persons of impeccable moral

_____

[1]Reliance on information gleaned from anonymous sources presents a special increment of risk, see Florida v. J.L., 529 U.S. 266, 270 (2000); White, 496 U.S. at 329, but those risks are absent here.

integrity. While the source's general credibility must be considered, all that the law requires is that, when all the pertinent considerations are weighed, the information reasonably appears to be reliable. See Gates, 462 U.S. at 230.

There is no point in beating a dead horse. In this case, the character, quality, and subsequent corroboration of the tip made it sufficiently reliable to provide a "specific and articulable" predicate for the investigatory stop. Terry, 392 U.S. at 21.

Central to this conclusion is the fact that the CI provided a plethora of details about the alleged drug trafficker's modus operandi — and a tip that describes the criminal activity in detail is more likely to be reliable. See Spinelli v. United States, 393 U.S. 410, 416 (1969); cf. United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002) ("The credibility of an informant is enhanced to the extent he has provided information that indicates first-hand knowledge.").

To illustrate, the CI specified the type and quantity of the drugs in transit, the transporter's method of travel, what bus line he would patronize, and the name of one of his confederates (Peter Tanguay). He also specified the date, time, and place of the suspect's arrival in Portland, the identity of the person who would meet him there, the exact vehicle that would be deployed, and the suspect's intended destination. In short, the tip was sufficiently

laden with details to demonstrate that the CI had inside knowledge of the events that he was describing.

The defendant's attack on this panoply of facts is impuissant. As framed, that attack places undue emphasis on the CI's inability to provide a detailed physical description of the alleged drug trafficker. Although vague or ubiquitous descriptions may raise Fourth Amendment concerns, see, e.g., United States v. Hudson, 405 F.3d 425, 438-39 (6th Cir. 2005), everything depends on context.

In this instance, we believe that the CI's description, viewed in light of the totality of the circumstances, was constitutionally sufficient to justify reasonable suspicion. Even though he did not recount the precise physical characteristics of the alleged drug trafficker, he specified the suspect's race — a datum that the police regularly use to facilitate identification, see 4 Wayne R. LaFave, Search and Seizure, A Treatise on the Fourth Amendment § 9.5(g), at 555-56 n.376 (4th ed. 2004) — and he supplied pertinent details about the suspect's whereabouts, associates, activities, and destination. As a result, the police were not simply looking for a black man; they were looking for a black man getting off the afternoon bus from New York City on July 29, at the Vermont Transit bus terminal in Portland, carrying illegal drugs, and being met by Peter Tanguay in the CI's green pick-up truck. We find that description constitutionally sufficient.

The defendant's asseveration that the police failed adequately to corroborate the tip is equally unavailing. The record, fairly read, suggests the opposite. In terms of corroboration, the authorities need not totally eliminate the risk that an informant is providing erroneous information. That would be an unrealistically heavy burden, and the law does not impose it: the police need only act with due diligence to reduce the risk of a mendacious or misguided informant. See United States v. Winchenbach, 197 F.3d 548, 556 (1st Cir. 1999).

In the case at hand, the police adequately discharged this duty through direct surveillance and fact-checking. See United States v. Jordan, 999 F.2d 11, 14 (1st Cir. 1993). Although they were frustrated in their efforts to make a positive identification in consequence of the July 7 tip, they were able to corroborate that certain events had taken place exactly as the CI had predicted (e.g., that a hotel room had been rented in the name of David Tanguay and that David Tanguay was incarcerated at the time). With respect to the July 29 tip, the police corroborated virtually every aspect of the account given by the CI. No more was exigible.

To continue along this line would be to paint the lily. The district court, after an evidentiary hearing, determined that the tip constituted reliable information justifying an investigatory stop. On this record, that determination was neither clearly erroneous nor contrary to law.

**2. The Arrest**. Having verified the constitutionality of the investigatory stop, we turn to the constitutionality of the ensuing arrest.

It is common ground that a warrantless arrest must be based on probable cause. See, e.g., United States v. Watson, 423 U.S. 411, 417-18 (1976); United States v. Figueroa, 818 F.2d 1020, 1023 (1st Cir. 1987). If a warrantless arrest is effected without probable cause for an arrest, evidence obtained as a result of the arrest is normally inadmissible against the arrestee. See, e.g., Brown v. Illinois, 422 U.S. 590, 601-02 (1975); Wong Sun v. United States, 371 U.S. 471, 484-86 (1963). Probable cause for an arrest "exists when the arresting officer, acting upon apparently trustworthy information, reasonably concludes that a crime has been (or is about to be) committed and that the putative arrestee likely is one of the perpetrators." Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 9 (1st Cir. 2004); see Beck v. Ohio, 379 U.S. 89, 91 (1964).

The defendant endeavors to ground his challenge to the existence of probable cause on the CI's unreliability. That endeavor is hopeless; we already have upheld the lower court's reliability determination and its corollary determination that the tip created reasonable suspicion sufficient to justify the roadside stop. See supra Part II(A)(1). The defendant's concerns about the CI's reliability were insufficient to undermine the lower court's

reliability determination in that context and, for the same reasons, those concerns cannot sully the arrest.

Of course, that is not the end of the matter. The defendant's challenge requires us to determine whether the police, after stopping the truck, developed probable cause for the ensuing arrest.[2] In making this determination, our assay is not confined to the contents of the tip but extends to the events occurring after the initiation of the stop. See United States v. Baldacchino, 762 F.2d 170, 175 (1st Cir. 1985). For the reasons limned below, we find fully supportable the district court's determination that the police reasonably concluded that a crime was being committed and that, therefore, probable cause existed to effect an arrest.

After stopping the truck, the police caught the suspect in several lies and inconsistencies related to his name, age, and ownership of the duffel bags. His demeanor during the stop evoked suspicion. Then, too, a police dog alerted to the presence of contraband inside the truck — and a reliable canine sniff outside a vehicle can provide probable cause to search the vehicle.[3] See United States v. Lopez, 380 F.3d 538, 544 (1st Cir. 2004). An

_____

[2]Because we determine that events after the Terry stop created probable cause for the arrest, we need not determine whether the information possessed by the officers before the stop, by itself, furnished probable cause for the arrest.

[3]While the existence of probable cause based on a positive canine sniff depends upon the dog's reliability, see United States v. Owens, 167 F.3d 739, 749 (1st Cir. 1999), the defendant does not question the dog's reliability on appeal.

interior vehicle sniff led the dog to single out one of the defendant's duffel bags. That, in turn, yielded up the cache of contraband. At that point, probable cause for the arrest was obvious.

### B. **Exclusion of Evidence**.

Next, the defendant complains that the district court improperly refused to admit testimony about his whereabouts on July 7, 2005 — the day of the first tip. That exclusion, he says, transgressed his Sixth Amendment right to present witnesses in his own defense.

We set the stage. At trial, the defendant sought to introduce testimony showing that he was in New York on July 7. He theorized that this testimony would impeach the government's suggestion that he was "Pink."

The government objected to this testimony. It noted that its case in chief had included no evidence of either the initial tip or the events of July 7. Thus, evidence of the defendant's whereabouts on July 7 was irrelevant to the charge that he possessed drugs with intent to distribute on July 29.

The district court refused to admit the testimony, concluding that the danger of confusing the issues (and, thus, misleading the jury) substantially outweighed any slight probative value that the testimony might possess. The defendant challenges this ruling. We discern no abuse of discretion.

-16-

The right of a defendant to offer witnesses in his defense is a fundamental component of due process. Washington v. Texas, 388 U.S. 14, 19 (1967). It is elementary, however, that the mere assertion of that right does not automatically and inevitably ensure the admissibility of the proffered testimony. See Taylor v. Illinois, 484 U.S. 400, 414-15 (1988). Competing interests are at stake, and district courts must carefully balance an accused's right to present evidence with considerations such as the integrity of the adversary process, the danger of unfairly skewing the truth-determining function that lies at the epicenter of that process, and the efficient administration of justice. See id. Conscious of the fact-sensitive nature of this enterprise, appellate courts are well-advised to give appreciable deference to the trier's calibration of these scales. See, e.g., United States v. Hadfield, 918 F.2d 987, 994-95 (1st Cir. 1990).

Here, the district court's ruling comes within the compass of Federal Rule of Evidence 403, which provides in pertinent part that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." We typically review Rule 403 determinations for abuse of discretion. See, e.g., United States v. Gobbi, 471 F.3d 302, 311 (1st Cir. 2006); United

-17-

States v. Maldonado-García, 446 F.3d 227, 231 (1st Cir. 2006). We apply that standard here.[4]

Abuse of discretion review has a special connotation in Rule 403 cases. As we have said, "[o]nly rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988).

Here, the district court acted well within the scope of its discretion in excluding the proffered testimony. Although that testimony might have played a part in determining the CI's reliability, that issue was litigated during the pretrial hearing on the motion to suppress. The relevance of the testimony to the substantially different mix of issues litigated at trial was tenuous at best. The testimony could not have been used to impeach any evidence adduced by the government in its case in chief: the indictment charged only a single episode of possession with intent to distribute, occurring on July 29, 2005. Similarly, the testimony was not alibi evidence; for aught that appears, the witnesses had no

_____

[4]Relying on United States v. Levy-Cordero, 67 F.3d 1002 (1st Cir. 1995), the defendant suggests that the Rule 403 determination in this case is subject to de novo review. This reliance is mislaid. In Levy-Cordero, the court reviewed a district court's exclusion of otherwise relevant alibi evidence based solely on a discovery violation. Id. at 1011. That does not bear any real resemblance to the situation here.

-18-

knowledge of the defendant's whereabouts on July 29. Finally, the government's case did not depend on whether or not the defendant and "Pink" were one and the same person.

In sum, testimony relating to the defendant's absence from Portland on a date more than three weeks prior to the date of the charged crime was, at most, marginally relevant to the case that was being tried. Given that meager probative value, we do not think it can fairly be said that the district court abused its discretion in weighing competing concerns and concluding that introduction of the testimony would raise a significant risk of confusing the issues.[5]

## C. __Sentencing__.

The defendant's final claim of error concerns the district court's sentencing algorithm. Specifically, he challenges the court's ruling that an "attempt" conviction for a state drug offense qualifies as a "felony drug offense" within the purview of the career offender provisions of 21 U.S.C. § 841(b)(1). This claim raises what appears to be a question of first impression (the parties cite no case law directly on point, and we have discovered none). Despite this dearth of direct authority, however, the answer is transparently clear.

---

[5]In a closely related vein, the defendant argues that the trial court, by refusing to allow him to cross-examine Cashman about the events of July 7, infringed his Sixth Amendment right to confront the witnesses against him. The district court premised this limitation on Rule 403. For the reasons articulated above, we find that limitation to be within the court's informed discretion.

The relevant facts are not in dispute. The jury convicted the defendant of violating 21 U.S.C. § 841(a)(1), which criminalizes possession of certain controlled substances (including cocaine) with intent to distribute. The statutory scheme contains specific penalty provisions applicable to recidivist drug offenders. See id. § 841(b). In pertinent part, it provides that if a person is convicted under section 841(a)(1) "after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release." Id. § 841(b)(1)(A).

At the disposition hearing in this case, the sentencing court found that the defendant had convictions for two prior felony drug offenses: a 1990 Massachusetts conviction for possession of a controlled substance with intent to distribute, see Mass. Gen. Laws ch. 94C, § 32A, and a 1996 New York conviction for attempted possession of a controlled substance in the third degree, see N.Y. Penal Law §§ 110.00, 220.16. These two predicate convictions combined to trigger a mandatory life sentence.

The defendant challenges the classification of the latter conviction as a proper predicate, contending that an "attempt" crime cannot constitute a "felony drug offense" within the meaning of section 841(b)(1). He posits that for "possession" crimes to be "felony drug offenses," the government must prove actual possession

by the accused — an element that is lacking in the typical attempt offense.

This contention presents an issue of statutory construction, which we review de novo. See United States v. Leahy, 473 F.3d 401, 405 (1st Cir. 2007). The Controlled Substances Act (CSA), 21 U.S.C. §§ 801-971, defines the term "felony drug offense." Id. § 802(44). This court has deemed that definition controlling for the purpose of determining whether the enhanced penalties provided under section 841(b)(1) are implicated. See United States v. Roberson, 459 F.3d 39, 51 (1st Cir. 2006). Consistent with analogous Supreme Court precedent, we eschew an examination of the particular facts of the putative predicate crime and instead read the term "felony drug offense" categorically. See Shepard v. United States, 544 U.S. 13, 26 (2005); Taylor v. United States, 495 U.S. 575, 602 (1990); see also Leahy, 473 F.3d at 411.

When interpreting a statute, we begin with its text. See Richardson v. United States, 526 U.S. 813, 818 (1999); Plumley v. S. Container, Inc. 303 F.3d 364, 369 (1st Cir. 2002). Under the applicable statutory definition, the term "felony drug offense" denotes "an offense that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs." 21 U.S.C. § 802(44).

-21-

The defendant's "attempt" crime is unarguably an offense punishable for more than one year under state law (indeed, the defendant's conviction for that crime resulted in a New York state incarcerative sentence of three to six years). Equally clear is that New York treats attempted criminal possession of a controlled substance in the third degree as a felony. See, e.g., City of New York v. Wright, 618 N.Y.S.2d 938, 939 (1994). The question, then, is whether the statute of conviction — here, the New York "attempt" statute — prohibits or restricts conduct "relating to narcotic drugs." As we explain below, we believe that it does.

The classification that Congress has built into the CSA sweeps broadly. To relate means to "show or establish a logical or causal connection between." Webster's Third New International Dictionary 1916 (1981). An attempt to possess a controlled substance is, by definition, connected logically and causally to narcotic drugs.

We add, moreover, that claiming that an attempt should be excluded from the definition of "felony drug offense" overlooks Congress's clear mandate, for purposes of the CSA, to treat inchoate offenses with as much gravity as the substantive offenses that underlie them. See, e.g., 21 U.S.C. § 846 ("Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or

-22-

conspiracy."). The defendant's proposed reading of the statutory phrase would mean that a federal conviction for an attempt to possess a controlled substance, itself an offense of sufficient gravity to trigger the recidivist provisions of section 841(b)(1)(A), would nonetheless, had a duplicate of that offense occurred earlier, be ineligible to count as a predicate offense when it came to applying those provisions. That would confound common sense — and we see no reason to believe that Congress intended so quixotic a result.

The case law confirms this intuition: it staunchly supports reading the phrase "felony drug offense" to include attempt offenses. Courts have labored over a similar interpretative task in the context of the Armed Career Criminal Act (ACCA), which requires mandatory sentences for recidivist offenders with three or more convictions for "a serious drug offense." 18 U.S.C. § 924(e). Those courts regularly have held that attempted possession with intent to distribute qualifies as a "serious drug offense," notwithstanding its inchoate character. See, e.g., United States v. Winbush, 407 F.3d 703, 708 (5th Cir. 2005); United States v. Alexander, 331 F.3d 116, 131 (D.C. Cir. 2003).

In a recent case interpreting the ACCA, we rejected a claim similar to the one before us, finding that conspiracy to violate a state drug law qualified as an ACCA predicate offense. United States v. McKenney, 450 F.3d 39, 42 (1st Cir. 2006)

(concluding that Congress's use of the word "involving" in the ACCA captures more than the actual manufacture, distribution, or possession with intent to distribute of a controlled substance); cf. James v. United States, 127 S. Ct. 1586, 1592 (2007) (holding that a conviction for attempted burglary constitutes a "violent felony" under the ACCA). The Sentencing Commission appears to be of much the same mind. See USSG §4B1.2, cmt. (n.1) (defining "controlled substance offense" under the career offender provisions of the federal sentencing guidelines to include inchoate offenses, such as attempts).

The short of it is that the defendant's reading of section 841(b)(1) is not only contrary to the statute's plain meaning but also threatens to frustrate Congress's express intent to punish inchoate drug-related crimes the same as completed ones. Consequently, we reject that reading and hold that, under section 841(b)(1), the term "felony drug offense" includes crimes (such as attempt crimes) that do not involve outright possession of narcotic drugs.

## III. CONCLUSION

We need go no further. For the reasons elucidated above, we conclude that the defendant was fairly tried, justly convicted, and lawfully sentenced.

**Affirmed**.

-24-