# Supreme Court of Texas

No. 23-0756

BRP-Rotax GmbH & Co. KG,
*Petitioner,*

v.

Sheema Shaik and Touseef Siddiqui,
*Respondents*

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

**Argued December 4, 2024**

JUSTICE YOUNG delivered the opinion of the Court.

JUSTICE BUSBY filed a concurring opinion, in which Justice Devine joined.

We must decide whether Texas courts may exercise specific personal jurisdiction over BRP-Rotax GmbH & Co. KG, an Austrian company that designs and manufactures aircraft engines. The answer depends on our application of the so-called "stream-of-commerce-plus" test, under which Rotax is subject to jurisdiction in Texas only if it had an intent or purpose to serve the Texas market. But far from reflecting Rotax's purposeful availment, the record conclusively establishes the

1

opposite. As we have repeatedly explained, the stream-of-commerce-plus test requires a defendant to *specifically target* Texas; it is not enough that a defendant may foresee some of its products' eventually arriving here.

This case requires us to break no new jurisprudential ground. Under our precedents, the lawsuit against Rotax should have been dismissed for lack of personal jurisdiction, and the lower courts erred by instead proceeding with the litigation. We therefore reverse the judgment of the court of appeals and render judgment dismissing the case against Rotax.

## I

Tragedy struck respondents Sheema Shaik and Touseef Siddiqui (together, the Shaiks) when a Piper Light Sport Aircraft suddenly lost engine power and crashed on the runway at an airport in Addison, Texas. Sheema, a passenger in the plane, suffered permanent and life-altering injuries. Touseef, her husband, witnessed the harrowing incident. As Texas residents injured in Texas, the Shaiks chose Dallas County as the place to adjudicate their claims and hold to account the numerous parties they believed responsible for their injuries. They asserted claims for strict liability, negligence, and gross negligence against the designer and manufacturer of the aircraft, the seller of the aircraft, and Rotax, which designed and manufactured the engine that lost power. The Shaiks initially sued multiple other parties, too, but dropped their claims against them in various amended petitions, leading to the sixth amended petition, which is their live pleading.

We are concerned today only with Rotax, which is headquartered in Gunskirchen, Austria. The Shaiks allege that Texas courts have

2

specific personal jurisdiction over Rotax because it "intentionally placed" the allegedly defective engine "into the stream of commerce" and "moved it along" to Texas.

Rotax responded to the suit by filing a special appearance under Texas Rule of Civil Procedure 120a, requesting that the court dismiss the case against it for lack of personal jurisdiction. Rotax relied on a declaration from its general manager and vice president of sales who stated, among other things, that Rotax:

- designs and manufactures its engines exclusively in Austria;
- never contracted with the Shaiks or any other Texas resident for the sale, installation, or repair of its engines;
- does no business in Texas;
- has no employees in Texas;
- has no offices in Texas;
- does not own or lease any real property in Texas; and
- has never targeted any advertising or other marketing activities to Texas residents.

The declaration further explained that Rotax sells its engines under distribution agreements with independent distributors, all of which are located not just outside Texas but outside the United States, and that Rotax does not provide direct product support for or repair Rotax engines.

Rotax sold the engine at issue here, for example, to Kodiak Research Ltd., a Bahamian company. Kodiak shipped the engine from Austria to the Bahamas. Kodiak then sold the engine to Lockwood Aviation Supply, Inc., its sub-distributor in Florida that was itself "an independent Service Centre located in Sebring, Florida," and Lockwood then sold the engine to U.S. Sports Aircraft, the Texas company that

3

installed the engine into the plane that crashed.

The Shaiks concede that Rotax lacks a physical presence in or direct connection to Texas. They acknowledge the attenuated way in which the allegedly defective engine reached Texas. But they counter that Rotax had numerous—albeit indirect—contacts sufficient for Texas courts to exercise specific personal jurisdiction. Any one of these contacts, they say, is enough to show that Rotax made "deliberate and systematic attempts to establish a market" in Texas and that "Rotax has pervasively served [that] market for decades and has reaped substantial profits by doing so." Had Rotax wished to avoid litigation here, the Shaiks continue, it should have "taken affirmative action" and severed its connection to Texas, "just as it d[id] [with] Iraq, Iran, and North Korea" by expressly forbidding its independent distributors from shipping Rotax engines to those countries.

The trial court and court of appeals agreed. Affirming the trial court's denial of Rotax's special appearance, the court of appeals concluded that Rotax "purposefully availed itself of Texas under the 'stream of commerce-plus' test." 698 S.W.3d 305, 309 (Tex. App.—Dallas 2023). Its purposeful-availment analysis purportedly "focus[ed] on the relationship among the forum, the defendant, and the litigation," and so it discussed the distribution agreement between Rotax and Kodiak; Rotax's website; a repair center in Bulverde, Texas, known as "Texas Rotax"; and the number of Rotax engines registered in Texas. *Id.* at 313–14.

But underlying the court of appeals' review of whether the trial court had specific personal jurisdiction over Rotax were the allegations that the Shaiks are Texas residents, that the aircraft was "leased and

4

operated by a Texas resident" who owned and operated a business in Texas, that "[t]he crash and [the Shaiks'] damages occurred in Texas," and that Rotax "is a global company." *Id.* at 313, 317. The opinion asserted an intent to follow this Court's decisions in *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399 (Tex. 2023), and *Luciano v. SprayFoamPolymers.com, LLC*, 625 S.W.3d 1 (Tex. 2021), as well as the U.S. Supreme Court's decision in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351 (2021). *See* 698 S.W.3d at 317–18. In doing so, the court of appeals concluded that Rotax "served a market in Texas for the very engine that [the Shaiks] alleged malfunctioned and caused them injury in this state" and "that exercising jurisdiction over [Rotax] would not offend traditional notions of fair play and substantial justice," meaning that the exercise of specific personal jurisdiction over Rotax was proper. *Id.* at 309, 317.

Rotax filed a petition for review, which we granted.

## II

A defendant's amenability to specific personal jurisdiction in Texas presents a question of law that we review de novo. *Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 558 (Tex. 2018). Where the "relevant facts" are undisputed, "we consider only the legal question [of] whether [those] facts establish Texas jurisdiction." *Id.*

Our analysis begins with some familiar boilerplate. "A court must have personal jurisdiction over a defendant to issue a binding judgment." *LG Chem Am., Inc. v. Morgan*, 670 S.W.3d 341, 346 (Tex. 2023). Texas courts, specifically, exercise personal jurisdiction over litigants by reference to the Texas long-arm statute and federal constitutional due-

5

process guarantees. *See id.*; *see also Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 149 (Tex. 2013) (quoting *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007)). While "[a]llegations that a tort was committed in Texas satisfy our long-arm statute," those allegations "must also satisfy due-process requirements." *Luciano*, 625 S.W.3d at 8 (first citing *Moncrief Oil*, 414 S.W.3d at 149; and then citing *Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010)).

Adhering to the U.S. Supreme Court's precedents, our primary concern in personal-jurisdiction cases is "the constitutional right to due process." *LG Chem*, 670 S.W.3d at 346 (citing U.S. Const. amend. XIV, § 1); *cf. Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009). Rotax has not invoked the Texas Constitution's due-course clause, *see* Tex. Const. art. I, § 19, so our analysis concerns only the limits imposed by federal constitutional law. We walk the path initially charted by *International Shoe Co. v. Washington*, in which the U.S. Supreme Court held that the exercise of personal jurisdiction is proper where the nonresident defendant has "certain minimum contacts" with the forum state "such that the maintenance of the suit" against it "does not offend 'traditional notions of fair play and substantial justice.'" 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

There are "two kinds of personal jurisdiction: general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." *Ford*, 592 U.S. at 358. The Shaiks contend only that Texas courts may exercise specific personal jurisdiction, which "covers defendants less intimately connected with a State, but only as to a narrower class of claims" than general jurisdiction would allow. *Id.* at

6

359. For Texas courts to do so here, the evidence must satisfy a well-established two-prong test. *See LG Chem*, 670 S.W.3d at 347. First, Rotax must have taken "some act by which [it] purposefully avail[ed] itself of the privilege of conducting activities within [Texas], thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Second, the claims must "arise out of or relate to" Rotax's Texas-focused activities. *Ford*, 592 U.S. at 359 (quoting *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 582 U.S. 255, 262 (2017)).

As for the first prong, we have adhered to the U.S. Supreme Court's reiterated teaching that the jurisdictionally relevant activities must have been the defendant's "own choice and not 'random, isolated, or fortuitous.'" *Id.* (quoting *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 774 (1984)). This "deliberat[e]" conduct may come in the form of "exploiting a market" in Texas. *See id.* (alteration incorporated) (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)). But these activities, "whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the [nonresident] defendant could reasonably anticipate being called into a Texas court" with respect to a particular claim. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002) (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

The Shaiks rely on one particular way of establishing purposeful availment: the so-called "stream-of-commerce-plus" test, first articulated in Justice O'Connor's plurality opinion in *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 105 (1987). Of course, no specific personal jurisdiction "exists over a [foreign] manufacturer whose product just happens to end up in the forum state" via the stream of

7

commerce. *Spir Star*, 310 S.W.3d at 876. However, we have found that in certain product-liability cases, plaintiffs may leverage the stream-of-commerce-plus test "to conceptualize [the manufacturer's] minimum contacts" with Texas. *Luciano*, 625 S.W.3d at 9. Indeed, the very point of the stream-of-commerce-plus test is that Rotax's "act of placing a product into the stream of commerce does not establish purposeful availment *unless* there is 'additional conduct' evincing 'an intent or purpose to serve the market in [Texas].'" *LG Chem*, 670 S.W.3d at 347 (emphasis added) (quoting *Moki Mac*, 221 S.W.3d at 577).

Over the years, we have identified a few examples of such "additional conduct" sufficient to establish that a nonresident defendant has purposefully availed itself of the privilege of conducting business activities in Texas, including "[a]dvertising in telephone directories in Texas cities" and "operating an office for sales information and support." *See, e.g.*, *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005) (first citing *Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 436 (Tex. 1982); and then citing *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 201 (Tex. 1985)). Additionally, and as relevant here, the stream-of-commerce-plus test finds purposeful availment where the nonresident defendant "creat[es], control[s], or employ[s] the distribution system that brought the product into [Texas]." *Luciano*, 625 S.W.3d at 10 (citing *CSR Ltd. v. Link*, 925 S.W.2d 591, 595 (Tex. 1996)). But all the while, and consistent with U.S. Supreme Court precedent, we have emphasized that the defendant's "*awareness* that the stream of commerce may or will sweep the product into [Texas] does not convert the mere act of placing the product into the stream into an act

8

purposefully directed toward [Texas]." *CSR*, 925 S.W.2d at 595 (emphasis added) (quoting *Asahi*, 480 U.S. at 112 (plurality opinion)).

Thus, a key point is that mere awareness, or "foreseeability," of a product's sale or distribution in Texas "alone" cannot "create minimum contacts" sufficient to "support personal jurisdiction." *Id.* at 595–96. In *TV Azteca v. Ruiz*, we summarized a host of our cases, which in turn applied recent decisions of the U.S. Supreme Court, as follows:

> [A] nonresident who places products into the "stream of commerce" with the expectation that they will be sold in the forum state may be subject to personal jurisdiction in the forum. *But even under that theory*, mere knowledge that the product will be sold in the forum state is not enough. A product seller's awareness that the stream of commerce *may or will sweep the product into the forum State* does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State. Instead, *additional conduct must demonstrate an intent or purpose to serve the market* in the forum State.

490 S.W.3d 29, 46 (Tex. 2016) (emphasis added) (internal quotation marks and citations omitted). For that reason, stream-of-commerce-plus jurisdiction attaches "only when the defendant *targets* the forum, not when the defendant merely *foresees* his product ending up there." *Luciano*, 625 S.W.3d at 13 (emphasis added). Relevant "additional conduct," in other words, must show "targeting" Texas in particular, not merely passive awareness of a likelihood—even a substantial likelihood verging on certainty—that products may eventually arrive in our State.

## A

The Shaiks allege that any one of four pieces of evidence demonstrates sufficient "additional conduct" to establish that Rotax

9

purposefully availed itself of Texas. First, the Shaiks claim that the distribution agreement between Rotax and Kodiak shows that Rotax "creat[ed], employ[ed], and control[led] a network of authorized distributors and servicers to sell and service . . . Rotax aircraft engines in Texas." That "service and distribution network," they say, was obligated to "market[] and advertis[e]" Rotax engines and replacement parts in Texas and at Rotax's direction. Second, the Shaiks assert that Rotax "specifically authorized" the repair center in Bulverde, Texas, known as "Texas Rotax," through which Rotax "servic[ed], repair[ed], and warrant[ied] hundreds of Rotax . . . engines in Texas." Third, the Shaiks argue that Rotax, through its website, "interact[ed] directly with Texans." And finally, they point to the number of Rotax engines registered here between 2016 and 2020—roughly 150—which, they say, shows that Rotax "sen[t] hundreds of . . . engines into Texas through its distributorship network."

We conclude that this evidence, whether taken individually or collectively, does not satisfy the requirements of the stream-of-commerce-plus test. Examining the Shaiks' four contentions shows why.

*First*, Rotax's "network of authorized distributors" or "service and distribution network" turns out to consist of just one relevant distributor: Kodiak. Kodiak, however, is indisputably an independent, Bahamian company in which Rotax holds no ownership interest. Importantly, *Rotax* has no distributors in Texas or even the United States. Instead, for its products to reach the aircraft-engine market for nearly half the globe, Rotax contracted with Kodiak pursuant to a distribution agreement. The agreement authorized Kodiak to sell Rotax products in what the agreement defined as Kodiak's "TERRITORY"—namely, the United

10

States, Central America, and most of South America, collectively constituting nearly the entire Western Hemisphere.

In its territory, Kodiak sells engines that it has purchased from Rotax through Kodiak's distribution centers in Florida, Wisconsin, and California. For example, Kodiak sold the allegedly defective engine that injured the Shaiks to Lockwood Aviation, which is Kodiak's sub-distributor in Florida. Kodiak, like Rotax, has no distributors or sub-distributors in Texas.

We find it telling, therefore, that to establish even an arguable basis for exercising jurisdiction over Rotax, the Shaiks continually treat Rotax and Kodiak as one and the same—often saying that "Rotax" *itself* "servic[ed]," "repair[ed]," "market[ed]," or "advertis[ed]" its engines outside Austria, where *only* Kodiak or its sub-distributors and dealers conducted those activities. Rotax and Kodiak, however, are not the same in any sense. The law provides ways to prove that Rotax either is in fact Kodiak or that Rotax so thoroughly controls Kodiak that it is justifiable to treat them as the same. But the Shaiks have made no such effort here, and the record in no way suggests that such an effort could succeed.

Verbs imputing *Kodiak's* actions to *Rotax*, therefore, cannot advance the Shaiks' effort, for "it is only the *defendant's* contacts with the forum that count." *Michiana*, 168 S.W.3d at 785 (emphasis added). Take, for example, the Shaiks' allegation that Rotax "sen[t] hundreds" of engines to Texas "through its distributorship network." That allegation is doubly imprecise: the Shaiks not only present no evidence that Rotax itself ever sent anything to Texas, but also improperly neglect Rotax's and Kodiak's status as "distinct corporate entities." *BMC Software Belg., N.V.*

11

*v. Marchand*, 83 S.W.3d 789, 798 (Tex. 2002). They have not argued that Kodiak is Rotax's agent, much less its alter ego. Indeed, we reject such an effort even for "parent" and "subsidiary" companies, so we are far less willing to do so for those that are unrelated. *See id.* at 799 ("To 'fuse' the parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary.").

Of course, Kodiak's independent status is not, by itself, a categorical basis for rejecting a jurisdictional allegation against Rotax. After all, "purposeful availment of local markets may be either direct (through one's own offices and employees) or indirect (through affiliates *or independent distributors*)." *Spir Star*, 310 S.W.3d at 874 (emphasis added). So "[w]hen an out-of-state manufacturer . . . specifically targets Texas as a market for its products, that manufacturer is subject to a product liability suit in Texas based on a product sold here, even if the sales are conducted through a Texas distributor or affiliate." *Id.* But again, "it is not the actions of the Texas intermediary that count, but the actions of the foreign manufacturer who markets and distributes the product to profit from the Texas economy." *Id.* Said differently, what matters is that Rotax must "specifically target[] Texas." *Id.* If a nonresident targets Texas by deploying others to achieve the goal, the outcome for purposes of personal jurisdiction is no different than if the nonresident targeted Texas directly.

There is no Texas "distributor," "affiliate," or "intermediary" here, but we have recognized that "a truly interstate business may not shield itself from suit by a careful, but formalistic structuring of its business

12

dealings." *Siskind*, 642 S.W.2d at 437 (quoting *Vencedor Mfg. Co. v. Gougler Indus., Inc.*, 557 F.2d 886, 891 (1st Cir. 1977)). In *Siskind*, we observed that the nonresident defendant "affirmatively s[ought] business in Texas" through its "advertising activities" and "practice of mailing informational packets," "applications," "invitations," and "contracts to Texas residents." *Id.* at 436. In concluding that the defendant purposefully availed itself of Texas, we said that it was "not determinative" that the defendant "accepted the contract and was to perform its obligations" in another state. *Id.* at 437. Indeed, that sort of "formalistic structuring" of business dealings did not allow the defendant to escape jurisdiction in Texas where its "purposeful act[s]" were otherwise sufficient. *See id.* at 436–37.

We therefore look to the distribution agreement between Rotax and Kodiak. What we find is nothing "formalistic" in the sense that *Siskind* used that term—that is, targeting Texas yet hoping to obscure that effort, such as by explicitly structuring its transactions with Texans to take place outside Texas while directly marketing those transactions inside Texas to Texans. The Shaiks allege that Rotax marketed and advertised its engines in Texas through its service and distribution network. But the distribution agreement makes *Kodiak* responsible for advertising in Kodiak's "TERRITORY"—which of course includes Texas—but mandates no particular location within that vast territory. It provides, for example, that Kodiak

> shall ensure that it and [its] dealers advertise, display, and demonstrate [Rotax's product] . . . in TERRITORY, and shall encourage and assist the dealers to advertise, display, demonstrate, and sell said PRODUCT to the public . . . at suitable locations and with adequate facilities.

13

It is hardly "formalistic" to recognize that unlike the transactions in cases like *Spir Star* and *Siskind*, nothing in the agreement here specifically targets or "directs marketing efforts to Texas." *Cf. Michiana*, 168 S.W.3d at 785 (observing that "a nonresident that *directs* marketing efforts *to Texas* in the hope of soliciting sales is subject to suit here in disputes arising from that business" (emphasis added)). The agreement expresses no view, much less any command, about whether any business at all will be transacted in Texas—it simply requires Kodiak to deliver results within a territory spanning two continents. If this were enough to constitute purposeful availment, then the stream-of-commerce-plus test would come to an end. Our unwillingness to disregard "formalistic structuring" would be transformed into the elimination of any requirement to identify conduct that actually targets Texas. Instead, we adhere to our precedents: *Targeting Texas* remains the touchstone. We will not overlook such targeting when it is wrapped up in various business arrangements, but neither will we find targeting that does not exist merely because a product ultimately comes to Texas.

True, the distribution agreement states that Rotax must provide "specific written permission" before Kodiak can use the Rotax name, "trademark," or "trade name." This general requirement has nothing to do with targeting any particular market, and that minuscule measure of control is in any event jurisdictionally unremarkable given that "a trademark owner has a duty to exercise control and supervision over [a] licensee's use of the mark." *E.g.*, *Ron Matusalem & Matusa of Fla., Inc. v. Ron Matusalem, Inc.*, 872 F.2d 1547, 1551 (11th Cir. 1989) (citing *Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 124 (5th

14

Cir. 1973)). We refuse to put nonresident defendants to such a choice: do not defend your marks (despite the law's requirements) *or* submit to our jurisdiction for doing so. Most importantly, as the distribution agreement shows, Rotax expressed no view about *where* Kodiak used its advertisements and did not control the frequency or method by which Kodiak did so.

*Second*, the Shaiks rely heavily on the mere existence of "Texas Rotax," the Bulverde-based service center, as a basis to subject Rotax to jurisdiction in Texas. But again, the distribution agreement shows that *Kodiak*, not *Rotax*, is wholly responsible for establishing Texas Rotax. It gives Kodiak the "right to establish, operate and maintain an adequate dealer organization"—"including authorized repair and service centers"— in any way that it chooses and anywhere within its territory, a space so vast that even Texas looks small. The agreement correspondingly makes Kodiak, not Rotax, responsible for "maintain[ing] and requir[ing]" Texas Rotax to have an "adequate inventory of spare parts, capable of adequately servicing" Rotax's engines, and it requires Kodiak, not Rotax, to ensure that Texas Rotax (or any such center that Kodiak creates) honors Rotax's limited warranty.

What is initially striking about each of these provisions is that none evinces an objective or purposeful intention of Rotax to do *anything* in Texas. Rather, these provisions relate to *Kodiak's* obligations in its territory, which simply includes Texas. Rotax never directed Kodiak to establish Texas Rotax specifically or to establish any center within Texas at all—Kodiak did so of its own accord with Rotax's general permission. Kodiak, not Rotax, was responsible for training at Texas Rotax; Kodiak,

15

not Rotax, reimbursed Texas Rotax for any warranty work that it did; and Kodiak, not the end-user or even Texas Rotax, would later be reimbursed directly by Rotax for the warranty claim. Simply put, there is no evidence that Rotax had any interest in any entity being in Bulverde or anywhere else in Texas as opposed to any other place within Kodiak's territory.

*Third*, the Shaiks are surely correct that Texans may have interacted with Rotax's website, but they have not identified anything about the website that targets Texas or Texans. Instead, they repeatedly emphasize that the website and especially the engine manual downloaded from the website were written in English as supporting Rotax's attempt to avail itself of Texas. This argument lacks merit. If any website's mere use of English illustrates an attempt to target Texas specifically—as opposed to the other jurisdictions within our nation and across the world that primarily speak English—then the work of the Texas courts should be expected to grow by massive proportions. Notably, the use of English in a website and manual about *airplane engines* is not limited even to the English-speaking world. For example, the International Civil Aviation Organization introduced language to "ensure that air traffic personnel and pilots are proficient in the English language." *See A38-8: Proficiency in the English Language Used for Radiotelephony Communications*, Int'l Civ. Aviation Org., https://www.icao.int/safety/lpr/Documents/A38.8.pdf. This recognition of English as the international language of aviation is not unique. *E.g., Paul v. Petroleum Equip. Tools Co.*, 708 F.2d 168, 172 (5th Cir. 1983) (noting the "threshold requirements for a commercial pilot certificate include proof that the applicant . . . is able to read, speak, and understand English").

Contrary to the Shaiks' argument that the website is "interactive" in a legally significant way, moreover, it is undisputed that Rotax engines cannot be purchased off the Rotax website. *See McFadin v. Gerber*, 587 F.3d 753, 762 (5th Cir. 2009) (concluding that "the website was passive," not "active," because it "provid[ed] no means for orders"). Prospective or current customers in the market for a Rotax engine could perhaps email Rotax through the website's home page, and it may be true that the allegedly defective engine here was inspected and installed using a Rotax engine manual downloaded from the website by someone in Texas. None of that moves the needle toward subjecting Rotax to jurisdiction. Those actions could have been taken by anyone from anywhere on Earth, but "[t]he unilateral activity of another party or a third person is *not an appropriate consideration* when determining whether a defendant has sufficient contacts" for specific personal jurisdiction. *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 417 (1984) (emphasis added).

*Finally*, and for the same reason, we reject the Shaiks' attempt to hale Rotax into Texas given the "hundreds" of engines that third parties have voluntarily registered as located in Texas. Such actions are even more attenuated and beyond Rotax's control than the commercial transactions that we have already described. We also cannot agree that the presence of these engines demonstrates any "profit" to Rotax, especially where the Shaiks have offered no evidence of any sales of Rotax engines by anyone to anyone in Texas beyond the single engine at issue in this case.

17

**B**

The Shaiks contend that the court of appeals' judgment "involved nothing more than a straightforward application of settled law." But for reasons that should now be apparent, "[e]xercising jurisdiction here would go far beyond anything we have approved in other commercial cases." *Michiana*, 168 S.W.3d at 786. The court of appeals principally relied on three cases: *Volkswagen*, *Luciano*, and *Ford*. 698 S.W.3d at 317–18. Its holding in this case pushes far beyond the boundaries of each of those cases.

In *Volkswagen*, this Court stressed the "control" of the German manufacturers in concluding that they were subject to specific personal jurisdiction in an enforcement suit brought by the State. 669 S.W.3d at 415 (noting how the manufacturers put actionable conduct "into unstoppable motion," which "did not derive from unilateral or independent action of [the distributor]"). *Volkswagen* was not even a "stream of commerce" case, nor does it have much utility here, where no sovereign is prosecuting any case against Rotax for purposefully violating Texas law inside Texas. *See id.* at 415, 417. The Court observed that a nonresident "defendant need not single Texas out in some unique way to satisfy constitutional dictates," but that was because "direct[ing] activity to *every* state" is no less a targeting of Texas as to whatever activity occurred within Texas. *Id.* at 420. The distribution agreement between Rotax and Kodiak does not resemble the control the German manufacturers exercised there, which amounted to directly and purposefully affecting cars already in Texas, and indeed there is no evidence that Rotax specifically targeted Texas *at all*. *See id.* at 415, 417, 420.

18

In *Luciano*, we emphasized the manufacturer's "purposeful acquisition of . . . warehouse space in Texas" where it (not someone else) "maintain[ed] a stock of merchandise," as well as its (not someone else's) retention of a "local sales representative" to "find customers" specifically in Texas. 625 S.W.3d at 11, 17 (stressing how all this was at the defendant manufacturer's own "direction and on [its own] dime"). Rotax did *none* of these things itself and certainly not on *its* "dime." *Luciano* is, in essence, like *Spir Star* and *Siskind*. The touchstone remains directly targeting Texas. We will not overlook it when it occurs, as it decidedly did there.

And in *Ford*, the manufacturer admitted that it had "substantial business [in the forum States]" and "actively s[ought] to serve the market for automobiles and related products in those States." 592 U.S. at 361 (taking this as an admission that Ford "purposefully availed itself of the privilege of conducting activities" in the forum states (alteration incorporated)). Indeed, even if we considered Texas Rotax as a *Rotax* contact with Texas, which for the reasons discussed above we do not, that single contact would be miles away from Ford's pervasive presence through dealerships and service centers spread across the forum states. *See id.* Unlike the evidence in *Ford*, in other words, there is no evidence that Rotax has conducted "substantial business" in Texas—let alone an admission by Rotax that it has purposefully availed itself of the privilege of doing business here. *See id.*

* * *

To summarize, Rotax is not Kodiak. Kodiak advertises, at its own discretion, within its territory and provides after-sale support for Rotax products. Nothing requires Kodiak to advertise in Texas as opposed to elsewhere in the Western Hemisphere. Kodiak—not Rotax—works with

19

sub-distributors and service centers like Texas Rotax throughout its territory. And Kodiak alone is responsible for further distributing Rotax's products and establishing service networks, according to whatever plan Kodiak deems best—including Texas or excluding it. So long as Kodiak is successful within its broad territory, Rotax is apparently happy—even if every engine Kodiak sold went to Brazil, Panama, or South Dakota.

We said, and now say again, that "stream-of-commerce jurisdiction requires a stream, not a dribble." *Michiana*, 168 S.W.3d at 786. All the evidence in this case demonstrates that Rotax's engine came to Texas by the unilateral actions of third parties—and certainly not from any "stream" engineered, controlled, or manipulated by Rotax. Here, the plaintiffs have not offered any evidence that Rotax—or its distributor Kodiak, or even a Kodiak sub-distributor—was routinely sending Rotax engines into Texas, let alone selling them to Texans. Instead, the evidence shows that (1) Rotax had one relevant distributor, Kodiak; (2) Kodiak had substantial discretion in marketing and advertising Rotax products; (3) engines were voluntarily registered in Texas but were not delivered there; (4) Kodiak was responsible for warranty claims and establishing Texas Rotax; and (5) the Rotax website was not interactive or targeted toward Texans.

We do not retreat from our observation in *Luciano* that, "[u]ndoubtedly, a nonresident defendant may 'purposefully avoid' a particular jurisdiction 'by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction.'" 625 S.W.3d at 9 (citation omitted). We find ourselves with such a case today and so are breaking no new ground in our holding. Indeed, we decline to give

20

even the slightest credence to the arguments that Rotax must have treated Texas the same way it does Iraq, Iran, and North Korea to avoid personal jurisdiction here. Rotax's instruction to its distributors not to ship its engines to these countries—countries notably targeted by international sanctions—hardly means that Rotax has, by default, purposefully availed itself of *every other forum* for which it did not give that instruction.

The evidence is legally insufficient to show that Rotax "has 'continuously and deliberately exploited [Texas's] market'" such that it can "'reasonably anticipate being haled into [Texas] courts' to defend actions 'based on' products causing injury there." *Cf. Ford*, 592 U.S. at 364 (alteration incorporated) (quoting *Keeton*, 465 U.S. at 781). Rotax contracted with a distributor that in turn had wide discretion in building a "distribution system that [ultimately] brought" the Rotax engine to Texas. *Cf. Asahi*, 480 U.S. at 112 (plurality opinion). But that is legally distinct from "creat[ing], control[ling], or employ[ing] the distribution system that brought [the product] to [Texas]." *See id.* In the end, Rotax's supposed "contacts with Texas"—*i.e.*, the mere fact that its engine allegedly failed in Texas and injured Texas residents—"were . . . fortuitous or accomplished by the unilateral actions of third parties," *cf. Volkswagen*, 669 S.W.3d at 406, meaning it did not purposefully avail itself of the privilege of doing business here.

Without purposeful availment, there can be no specific personal jurisdiction over Rotax. *Cf. Luciano*, 625 S.W.3d at 13. Without any "Texas activities," *see id.* at 16, we cannot proceed any further in the specific-personal-jurisdiction analysis.

### III

All told, this case is not among those "narrower class of claims" where specific personal jurisdiction is proper. *See Ford*, 592 U.S. at 352. We reverse the judgment of the court of appeals and render judgment dismissing the case against Rotax.

Evan A. Young
Justice

**OPINION DELIVERED:** June 20, 2025

22